UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANNA BASSO,
AMY HARTMAN, and
JAIME VILLA RUIZ,

           Plaintiffs

       v.

NEW YORK UNIVERSITY,

           Defendant.

Civil Action No. 16 Civ. 7295 (VM) (KNF)

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
<u>MOTION FOR CLASS CERTIFICATION</u>**

**GISKAN SOLOTAROFF & ANDERSON LLP**
217 Centre Street - 6th Floor
New York, NY 100013
Telephone: 212.847.8315

**SCHWARTZ, PONTERIO & LEVENSON, PLLC**
134 West 29th Street – Suite 1006
New York, New York 10001
Telephone: (212) 714-1200

*Attorneys for Plaintiffs and the Proposed Class*

## TABLE OF CONTENTS

Table of Authorities……………………………………………………………………………iii

Introduction………………………………………………………………………………………1

Statement of Facts……………………………………………………………………………...5

    Creation of Tisch Asia……………………………………………………………………5

    Financial Problems………………………………………………………………………6

    Lack of Support from NYU………………………………………………………………7

    Financial Unsustainability………………………………………………………………...8

    Termination of Shirazi……………………………………………………………………9

    Differences Between Tisch Asia and Tisch NY……………………………………………11

        Artistic Director………………………………………………………………12

        Faculty Issues…………………………………………………………………13

        Facilities………………………………………………………………………14

        Career Development…………………………………………………………...15

        Scholarships…………………………………………………………………...16

        Admissions……………………………………………………………………16

        Differences in Curriculum……………………………………………………16

        Internships……………………………………………………………………16

    Closure Announcement……………………………………………………………………17

    Class Representatives………………………………………………………………………18

Procedural History……………………………………………………………………………...19

Argument…………………………………………………………………………………………19

    Elements Of Rule 23(a) And (b)(3) And Applicable Standards…………………..……….19

    The Class Is Ascertainable and The Requirements of Rule 23(A) Are Readily Met……21

        The Class Is Ascertainable……………………………………………………21

i

The Proposed Class Satisfies Rule 23(a)…………………………………………...22

    The Proposed Class Is Sufficiently Numerous…………………………..22

    There Are Common Questions of Law or Fact…………………....…..22

    Plaintff's Claims Are Typical of Those of Other Class Members…........24

    Adequacy Is Satisfied…………………………………………………25

The Requirements of Rule 23(b)(3) Are Met……………………………………………26

    Common Questions of Law or Fact Predominate as To Plaintiff's Claim………27

    A Class Action Is the Superior and Most Efficient Method for Adjudicating This Action……………………………………………………………………………29

Conclusion……………………………………………………………………………30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amchem Prods. v. Windsor,*
521 U.S. 591 (1997); *accord Brown*, 609 F.3d at 476.............................................................. 27

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
133 S. Ct. 1184 (2013).............................................................................................................. 21

*Assif v. Titleserv, Inc.,*
288 F.R.D. 18,  (E.D.N.Y. 2012) .............................................................................................. 22

*Attenborough v. Const. & Gen. Bldg. Laborers' Local 79,*
F.R.D. 82 (S.D.N.Y. 2006) ....................................................................................................... 28

*Brown v. Kelly,*
609 F.3d 467 (2d Cir. 2010)...................................................................................................... 19

*Damassia v. Duane Reade, Inc.,*
250 F.R.D. 152 (S.D.N.Y. 2008) .............................................................................................. 26

*Daniels v. City of N.Y.,*
198 F.R.D. 409 (S.D.N.Y. 2001) .............................................................................................. 24

*Gen. Tel. Co. of the Sw. v. Falcon,*
457 U.S. 147, 161 (1982)........................................................................................................... 20

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
574 F.3d 29 (2d Cir. 2009)........................................................................................................ 25

*In re Initial Pub. Offering Sec. Litig.,* ..................................................................................... 20

*In re Libor-Based Fin. Instruments Antitrust Litig.,*
11 MD 2262 (NRB), 2018 U.S. Dist. LEXIS 33640, at *89-90 (S.D.N.Y. Feb. 28, 2018) ..... 21

*In re Nassau Cnty. Strip Search Cases,*
461 F.3d 219,  (2d Cir. 2006)................................................................................................... 27

*In re Nigeria Charter Flights Contract Litig.,*
233 F.R.D. 297 (E.D.N.Y. 2006).............................................................................................. 28

*In re Petrobras Sec. Litig.,*
862 F.3d 250 (2d Cir. 2017)................................................................................................ 20, 21

*In re U.S. Foodservice Inc. Pricing Litig.,*
729 F.3d 108 (2d Cir. 2013)................................................................................................ 27, 29

*In re Visa Check/MasterMoney Antitrust Litig.*,
   280 F.3d 124, (2d Cir. 2001)........................................................ 28

*In re Vitamin C Antitrust Litig.* ..................................................... 22

*Joel A. v. Guiliani*,
   218 F.3d 132, (2d Cir. 2000)........................................................ 25

*Makaeff v. Trump Univ., LLC*,
   No. 3:10-cv-0940-GPC-WVG, 2014 U.S. Dist. LEXIS 22392 (S.D. Cal. Feb. 21, 2014).. 3, 28

*Marisol A. v. Giuliani*,
   126 F.3d 372 (2d Cir. 1997)........................................................ 24

*Nw. Nat'l Bank of Minneapolis v. Fox & Co.*,
   102 F.R.D. 507,  (S.D.N.Y. 1984) ................................................. 22

*Robidoux v. Celani*,
   987 F.2d 931,  (2d Cir. 1993)...................................................... 22

*Seijas v. Republic of Arg.*,
   606 F.3d 53 (2d Cir. 2010)......................................................... 26

*Sykes v. Mel Harris & Assocs. LLC*,
   285 F.R.D. 279 (S.D.N.Y. 2012).................................................. 23

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011)............................................................. 20

**Statutes**

§ 4.25, p. 156 (4th ed. 2002) ......................................................... 27

Civil § 23.46[1] (3d ed. 2011) ....................................................... 29

**Rules**

Fed. R. Civ. P. 23(a) ................................................................ 20

Fed. R. Civ. P. 23(a)(1)............................................................. 22

Fed. R. Civ. P. 23(a)(2)............................................................. 22

Fed. R. Civ. P. 23(a)(3)............................................................. 24
Fed. R. Civ. P. 23(a)(4)............................................................. 25

iv

Fed. R. Civ. P. 23(b)(3)..............................................................................................20, 26, 29

Fed. R. Civ. P. 23(g) ..................................................................................................... 28

*Robidoux*, 987 F.2d at 935-36........................................................................................ 22

## I.     INTRODUCTION

Plaintiffs Anna Basso, Amy Hartman, and Jaime Villa Ruiz ("Plaintiffs") file this brief in support of their Motion for Class Certification pursuant to the Order of the Court dated June 21, 2018 (Dkt. No. 82). Plaintiffs are former graduate students of New York University Tisch School of the Arts, Asia ("Tisch Asia") whose claims against Defendant New York University ("Defendant" or "NYU") are representative of all other students who attended Tisch Asia and who have been harmed by Defendant's misrepresentations, omissions, and unfulfilled promises regarding Tisch Asia.

NYU started Tisch Asia in Singapore in 2007 and expressly promised its students that there would be "no differences between the education received in Singapore and the education received in New York." The promise was made in many ways, including in the FAQs from the NYU website:



Under any circumstances, it would have been difficult for Tisch Asia to meet this ambitious promise to replicate the New York program in a new school in Singapore. The School of the Arts at New York University in New York ("Tisch NY") is a storied program founded in 1965. Its alumni and faculty are world-renowned. Most importantly, it has the full backing of New York University at large and its administration.

Discovery has revealed, however, that Tisch Asia was a five-year experiment, doomed from its inception by poor planning and a lack of institutional support from NYU. As NYU faculty noted in a March 2013 Letter to NYU Board of Trustees: "We are troubled by the likelihood that NYU's students are charged full tuition for programs **hastily and inexpertly created**... Such practices are unfair, and even dangerous, to our students, and therefore harmful to NYU's reputation." Ex 1 at NYU0020246[1].  Tisch Asia faced severe financial problems from Day 1, problems that threatened its very existence. Most importantly, Tisch Asia never had the support of NYU administration.

Tisch Asia was the vision of its founder and President, Pari Shirazi ("Shirazi"). Shirazi knew that the financial survival of Tisch Asia depended upon the addition of an undergraduate program. It was part of her proposal from day one, but NYU never allowed an undergraduate program, and this refusal doomed Tisch Asia to failure. Instead, it permitted the Tisch Asia "experiment," a five-year project that had to prove itself. It was to be separate from the renowned Tisch NY school and was not to be supported by NYU after an initial start-up program. Further, its survival depended on a bailout by the Singapore government, a bailout that never happened.

The evidence common to all class members will prove that Defendant negligently or willfully omitted from the students the material fact that Tisch Asia was a five-year experiment

---

[1] All Exhibits ("Ex.") referenced herein are attached to the Declaration of Oren Giskan in Support of Plaintiffs' Motion for Class Certification ("Giskan Decl.") filed herewith.

with an unsustainable financial model, and far from identical to Tisch NY. Had the students known these facts, they would not have attended Tisch Asia. Ex 2; Ex 4, Declarations of *Basso Decl.*, ¶ 4; *Hartman Decl.*, ¶ 4; *Ruiz Decl.*, ¶ 4.[2]

The evidence also demonstrates that all Tisch Asia students were negatively impacted by the symptoms of an inexpertly, hastily created program that had no support from the top NYU administration, resulting in the broken promises the school made to the students during recruitment such as the ones on the NYU website stating that there was no difference between the education received at the two schools, that their curricula were identical, and that Tisch Asia faculty were world-renowned working professionals with strong ties to the industry.

Plaintiffs respectfully request that the Court certify a class defined as follows: "All students who attended NYU Tisch School of the Arts, Asia" (the "Class"). Cases like this, where Defendant made identical misrepresentations and omitted identical material facts from large groups of individuals are well suited for class treatment, and in this case the requirements of Rule 23 are easily satisfied. In *Makaeff v. Trump Univ., LLC*, No. 3:10-cv-0940-GPC-WVG, 2014 U.S. Dist. LEXIS 22392 (S.D. Cal. Feb. 21, 2014), for instance, the court certified a class of Trump University students where the class members were exposed "to the alleged deceptive and misleading representations," reasoning that "[a] class action has the ability to determine on a class wide basis whether misrepresentations were made and whether they were material." *Makaeff*, 2014 U.S. Dist. LEXIS 22392, at *25.[3]

---

[2] Ex. 2 are excerpts of postings on a Facebook group established by students to discuss a potential lawsuit over the Tisch Asia program. The pages are marked "Bousley 163-298". *See* Ex. 3, Deposition Transcript of Stephanie Bousley Tr., 15-16, 124. Over 200 former Tisch Asia students joined this group.

[3] The class in the Trump University case was partially decertified in a later decision. *Makaeff v. Trump University LLC*, 309 F.R.D. 631, 643 (S.D. Cal. September 18, 2015). The Court decertified for damages but maintained certification for liability. The question of whether such bifurcation would be appropriate here could be decided prior to trial.

3

Each of the requirements of Fed. R. Civ. Proc. 23 are met here:

***Numerosity***. There are over 300 hundred Tisch Asia students. The class members, who are easily identified from Defendant's enrollment records, have all been similarly harmed by Defendant's misconduct.

***Predominance of Common Issues.*** There are common questions of law or fact that predominate over any individual issues, including the central, overriding issues of (1) whether Defendant misrepresented to the putative class members that Tisch NY and Tisch Asia provided the same education, and (2) whether Defendant omitted from the putative class members the material fact that Tisch Asia was a five-year project with unsustainable financial model and uncertain future.[4]

***Typicality.*** Plaintiffs' claims are typical of those of other class members as Defendant's omissions and promises made on its website apply to all Tisch Asia students, and Defendant's liability as to Plaintiffs and all other class members will depend upon the same legal theories. Further, Defendants have no unique defenses against Plaintiffs.

***Adequacy.*** Plaintiffs are adequate class representative with no interests antagonistic to the other members of the Class, are represented by experienced counsel, and are committed to the vigorous prosecution of this action as demonstrated by their extensive cooperation during discovery and declarations annexed hereto.

***Superiority***. By combining all class members' claims challenging Defendants' uniform misrepresentations and omissions of material facts, those claims are presented far more fairly and efficiently than they would be in individual actions.

---

[4] Plaintiffs moved to amend their complaint adding a negligent omissions claim. Judge Fox, in denying the motion, held that the negligent omission claim was part of the existing negligent misrepresentation claim. Docket 78.

For these reasons, as set forth more fully below, the Court should grant Plaintiffs' motion for class certification.

## II.     STATEMENT OF FACTS

### A.     Creation of Tisch Asia

Tisch Asia was the brain child of Pari Shirazi.[5] She spent years developing a program for international students that would be based on the Tisch NY curriculum. Shirazi presented the proposal with the Dean of Tisch NY, Mary Schmidt Campbell, to NYU administration, including the then Provost, David McLaughlin. Importantly, the proposal called for graduate program and an undergraduate program. Shirazi was told by NYU administration that she would need to prove the academic success of the graduate program, before an undergraduate program would be approved. Ex 5, Deposition Transcript of Pari Shirazi, 28-29. Accordingly, NYU approved a graduate program only in Singapore in December 2006.

Though some preparations were made prior to that time, a program was quickly put together over the next few months so the school could open in September 2007.[6] Ex 5, Shirazi Tr., 34.[7] ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████ Ex 7. ████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[5] At the inception of Tisch Asia, Shirazi was President of Tisch Asia. The other notable administrators in the Tisch Asia story were John Sexton ("Sexton"), then President of NYU, David McLaughlin ("McLaughlin"), then Provost of NYU, and Mary Schmidt Campbell ("Campbell"), then Dean of the Tisch School of the Arts at NYU.
[6] The decision to open a graduate film program in Singapore, a place with no "film, or theatre industry to speak of," Ex 6, was itself questionable.
[7] References to the deposition testimony submitted in support of this motion shall be by witness name and transcript ("Tr.") page number.

██████████████████████████████████ Ex 8.[8] Even the campus itself was not ready. Ex 3, Deposition Transcript of Stephanie Bousley, 64, 65-66, 70.

### B.    Financial Problems

Tisch Asia ran into financial problems immediately and it went downhill from there. The construction of the Tisch Asia campus was substantially over budget and Tisch Asia spent nearly its entire operating budget for the first two years on renovation costs. Ex 5, Shirazi Tr., 50-52. Among other things, NYU had severely underestimated the cost of sand necessary for the construction. Ex 5, Shirazi Tr., 51. Other costs were also higher than expected. Enrollment was far lower than projected. By the end of the first year, Tisch Asia knew the financial model was unsustainable. Ex 9 Campbell Tr., 86. The situation never got better. *Id.* Campbell Tr., 90-91.

Incredibly, Defendant commenced operation of Tisch Asia without realizing that tuition was subject to a 7% tax by the Singapore government. Ex 5 Shirazi Tr. 38. If the tax were applied, it would render the endeavor unsustainable. Shirazi was able to negotiate a grant from the Singapore government for 5 years to cover the tax, but it was a ticking time bomb that hung over Tisch Asia for the next 5 years and threatened the school's very existence. Ex 10 at SHIRAZI04384, Ex 11 and Ex 12. Tellingly, NYU President John Sexton saw this as an "opportunity" to close Tisch Asia and move the film program to NYU's new school in Abu Dhabi, a project he favored over Tisch Asia. Ex 13. None of this was disclosed to potential students.

---

[8] In hindsight, Campbell testified about what she would have done differently: "[W]hen those people from Singapore walked into my office for the first time, I should have had a much clear-eyed understanding of what the true costs would have been to sustain the program over five years, and I should have asked them for a ton of money and I should've said either you give this to me or we can't do the program. That's what I would have done differently." Ex 9, Deposition Transcript of Mary Schmidt Campbell at 305.

The financial problems continued as Tisch Asia failed to meet its enrollment goals. Shirazi asked NYU for recruitment assistance but she did not receive support from the Provost.[9] Ex 5, Shirazi Tr., 127, 174; Ex 15, Deposition Transcript of David McLaughlin, 167.

### C.    Lack of Support From NYU

Tisch Asia never had the full support of the NYU administration. Internally, NYU made very clear that Tisch Asia was a "school project" not a "university project." Ex 16 Deposition Transcript of John Sexton, 74-75. This was significant. Ex 17 at SHIRAZI05691 ("Tisch Asia ... was not a university project. ... [B]oth he and Provost McLaughlin are on the record opposing the Tisch Asia project. It was a school program that was not on the university's radar[.]") Unfortunately for Plaintiffs and other Tisch Asia students, only "university projects" receive proper planning and support from the NYU administration. Ex 15, McLaughlin Tr., 188, Ex 18. As a result, Tisch Asia was seen as a "startup," (Ex 19) an ███████ (Ex 20) and a "project,"[10] as opposed to being an integrated part of the long history and tradition of Tisch NY. Ex 22, Deposition Transcript of Wendy Hammond., 66-67. This fact was never disclosed to Tisch Asia students. Ex 3 Bousley Tr., 88.

Once Tisch Asia began losing money, it was effectively abandoned by NYU, as no steps were taken to sustain the program. Indeed, from the beginning, Provost McLaughlin was more worried about the lack of a financial benefit to Tisch NY then he was about Tisch Asia. Ex 23.[11]

---

[9] David McLaughlin, then the Provost, observed in 2011 "absent much larger contributions form EDB and/or further contributions from Tisch NY, enrollments would have to double without an increase of expenses to get close to financial sustainability. On the face of it, this would not seem to be feasible." Ex 14.

[10] *See* Ex 21 ("Tisch Asia is a five-year project. At the end of the fifth year, the Trustees will review this project and see if we will continue.")

[11] McLaughlin's lack of support was also evidenced by his concern that NY faculty would leave for Tisch Asia Ex 5, Shirazi Tr., 86, and the effect of Tisch Asia on NYU expansion plans in New York. Ex 5, Shirazi Tr., 88.

The tension between Tisch Asia and NYU was so bad that Shirazi believed McLaughlin was taking steps to make sure Tisch Asia failed.[12] Ex 24, Ex 5 Shirazi Tr., 173. For example, there was conflict between an undergraduate program at Tisch Asia and that being pursued by NYU President Sexton in Shanghai. *See* Ex 25 at P10595 ("President Shirazi said that we always knew we would need more than a graduate program to be a financially sustainable graduate program. President Shirazi wanted to create an undergraduate program and she wrote the curriculum for it, but the NYU hierarchy put a stop on this because of NYU in Shanghai. Some in the NYU hierarchy are afraid that Shanghai would lose students to us, she said."); *Id*. at P10595: ("An undergraduate program here might be seen as competition for President John Sexton's undergraduate program in Shanghai."); Ex 5, Shirazi Tr., 233. *See also* Ex 26 (enrollment in Tisch Asia would be "detrimental" to NYU's other international programs).

In describing the tension between Tisch Asia and NYU, Dean Campbell stated, "Surrender is not possible. We are in a battle and we need troops to fight." Ex 27.

### D.    Financial Unsustainability

Shirazi's plan was always to support the graduate program with an undergraduate program to make Tisch Asia financially sustainable,[13] but every proposal was rejected by the NYU administration even though the Singapore government was very much interested in developing a joint undergraduate program with the National University of Singapore.[14] No one from NYU could testify as to what the problems were with the proposals. *See e.g.*, Ex 15

---

[12] Shirazi believed McLaughlin was opposed to Tisch Asia from the beginning. Ex 5, Shirazi Tr., 242.
[13] *See* Ex 28 at P10578 ("Graduate programs are usually very expensive and don't survive without undergraduate programs."); *see also*, Ex 22, Hammond Tr., 58-59, and Ex 15 McLaughlin Tr., 84-85 (Undergraduate program at Tisch NY sustains the graduate program).
[14] Dean Campbell also recognized that an undergraduate program would create a greater revenue base. Ex 9, Campbell Tr., 68.

McLaughlin Tr., 78. Notably, Campbell recognized at the time that Sexton did not support an undergraduate program in Singapore. Ex 29, Ex 9 Campbell Tr., 214.[15]

Shirazi created other graduate programs in Producing and Animation, but it was still not enough. Tisch Asia was nowhere near financially sustainable and was forced to seek more money from the Singapore government. No additional support was forthcoming without NYU agreeing to at least a joint undergraduate program in Singapore with the National University of Singapore ("NUS"). NYU continued to reject any undergraduate program.

The cash flow problem was described internally as severe, (Ex 9, Campbell Tr., 168) and there were concerns with even making payroll or paying Tisch Asia's bills. Ex 30. Tisch Asia was not able to pay back its loan from the Singapore government. Ex 5, Shirazi Tr., 252.

E.     Termination of Shirazi

Shirazi was eventually fired for allegedly transferring funds from Tisch NY to keep Tisch Asia afloat. Shirazi testified that she had been authorized to use the funds for Tisch Asia and there is ample evidence that NYU was aware of these transfers. Ex 5, Shirazi Tr., 72-73, 95-96. Dean Campbell and Provost McLaughlin were on the Board of Directors of Tisch Asia and received regular financial updates. At best, they were asleep at the wheel. Ex 31. The firing of Shirazi created a chaotic atmosphere at Tisch Asia. Ex 37, Deposition Transcript of Anna Basso, 73-74; Ex 38, Deposition Transcript of Amy Hartman Tr., 143-144, 288; Ex 32 (staff morale low).

Shirazi and NYU are currently in litigation regarding her termination. The only relevance here is that the termination of Shirazi was highly disruptive to the academic environment at

---

[15] In perhaps her most desperate attempt to distance herself from the Tisch Asia fiasco, Dean Campbell testified that she could not recall if Shirazi even proposed an undergraduate program prior to the discussion of a joint program with NUS. Ex 9, Campbell Tr., 67. *See also* Ex 15, McLaughlin Tr., 32 (unable to recall whether he discussed the addition of an undergraduate program to Tisch Asia).

Tisch Asia. Ex 22, Hammond Tr., 101-102, 132-135.[16] She was the creator and President of Tisch Asia and she was beloved by faculty and students alike. Most importantly though was that when Tisch Asia lost Shirazi, the students lost the only person who was truly fighting for the continued existence of their school.

Following Shirazi's termination, two things happened: NYU brought in Joseph Juliano to conduct a financial review of the program and John Sexton took over negotiations with the Singapore government.

The NYU administrators demonstrated a remarkable insensitivity to the financial woes of Tisch Asia. During this period, Juliano and another administrator, Nancy Morrison made numerous trips to Singapore. ████████████████████████████ ████████████████████████████[17] Ex 33, Deposition Transcript of Joseph Juliano, 41. ██████████████████████████████ In fact, every time Campbell and Sexton travelled to Singapore, they flew business and stayed at luxury hotels, indifferent to the fact that Tisch Asia was about to be closed for financial reasons.

Juliano's conclusions were revealing: ████████████████████ ██████████████████████████████████ ██████████████████████████████ ████████████████████████████████ ██████████████████████████

President Sexton attempted to negotiate additional subsidies from the Singapore

---

[16] In his testimony, Sexton belittled the students' reaction calling it "high dudgeon." Ex 16 Sexton Tr., 168.
[17] Other NYU administrators also flew business class and stayed at expensive hotels. It was so *de rigueur* that President Sexton actually testified, "I think the only seats in the plane are business class." (*See* Exhibit 16, Sexton Tr., 54.

government, but his efforts were unsuccessful.[18] Although he spent a great deal of time on the negotiations, Sexton could not explain the reason for the failure. Ex 16, Sexton Tr., 165-166. Given the conflict between Tisch Asia and Sexton's other pet projects, one might very well question why he approached the negotiations by asking for so much, while adamantly refusing to give the one thing that Singapore wanted, an undergraduate arts program. Sexton and the NYU administration were far more supportive of NYU's international campuses in Abu Dhabi and Shanghai, and would do nothing to harm those programs, including foreclosing arts programs at those schools by agreeing to grant Singapore the exclusive rights to an NYU arts program in Asia. *See* Ex 36 (noting any change in Singapore would open opportunities in Abu Dhabi).

###### F.      Differences Between Tisch Asia and Tisch NY

Tisch Asia students relied on NYU's representations that the education would be the same as it offered in New York in deciding to enroll in Tisch Asia. Ex 3, Bousley Tr., 30, 33, 38, 42-43; Ex 37, Basso Tr., 36, 39, 50, 119, 126-127; Ex 38, Hartman Tr., 154-155, 258; Ex 39, Deposition Transcript of Jamie Villa Ruiz, 36-37, 62-66, 75-77. Although NYU promised an identical education to the one it offered in New York, and although it charged the same $50,000 annual tuition, NYU's poor planning for Tisch Asia had harmful effects on the instruction received by the students and the instruction fell short of this promise.

The chaos surrounding Tisch Asia was in stark contrast to the stable and storied program in New York. The programs were not the same. Tisch NY had the support of NYU; Tisch Asia did not. Tisch NY had an undergraduate program to support the graduate program; Tisch Asia did not. Tisch NY had a full career development department; Tisch Asia did not. Tisch NY had

---

[18] It is not hard to imagine that Singapore balked when Sexton asked for the sun and the moon. *See* Ex 35 (listing elements of proposal to Singapore government). It is almost as if Sexton intentionally doomed the request by asking for more than he knew the Singapore government would be willing to give.

numerous scholarships for students; Tisch Asia did not. Tisch NY had a competitive admissions process;[19] Tisch Asia did not. Tisch NY had full enrollment; Tisch Asia did not. Tisch NY was fully funded and did not need government support; Tisch Asia was financially precarious and was dependent on the support of the Singapore government. Tisch NY had steady leadership; Tisch Asia's changed from year to year. Tisch NY faculty taught their students in person; Tisch Asia faculty taught some classes by Skype or e-mail correspondence. Tisch NY had countless internship opportunities; Tisch Asia had far fewer. Tisch NY had Spike Lee, a deeply committed and involved Artistic Director; Tisch Asia had Oliver Stone, who visited once or twice a year, and sometimes not at all.

### 1.   Artistic Director

Tisch Asia described the role of artistic director as:  Ex 41 at NYU5617.

The contrast between Oliver Stone and Spike Lee was stark. Oliver Stone visited Tisch Asia once or twice a year (less in certain years) and held a workshop. Ex 38, Hartman Tr., 67, Ex 39, Villa Ruiz Tr., 108-09; Ex 37, Basso Tr., 238-240, Ex 2, at Bousley 178, 293. Stone was not available to students or faculty otherwise. There is no evidence that he did any of the tasks in the description above.

---

[19]

In contrast, Spike Lee, the Tisch NY Artistic Director: taught a class every year (and allowed all 3rd year students to sit in) that students considered a "very important" course;[20] provided internships for Tisch NY students to work on his films; brought prominent colleagues into his classes to give lectures; provided input to Dean Campbell on the graduate film program; recruited students to improve diversity; provided guidance on curriculum; hired students after graduation to work on his films; make introductions for students in the industry; maintained office hours for students, even if they were not in his class. Ex 9, Campbell Tr., 295-301.

## 2.     Faculty Issues

NYU specifically represented to the Plaintiffs and other similarly situated class members that "[Tisch Asia] faculty are working professionals in the industry," that "each member of the faculty has been meticulously selected to teach at [Tisch Asia] because of their strong ties to the industry," and that "[a]ll programs that are in both New York and Singapore … are taught by Tisch School of the Arts world-renowned faculty."[21] ██████████████████ ████████████████████████████████████ Ex 42 and 43.

While Tisch Asia was initially staffed with many of NYU's New York faculty, over time, the school hired less qualified faculty. Ex 37, Basso Tr., 78-82, 114-116, 136, 140, 221; Ex 39, Villa Ruiz Tr., 81-82, 113-118, 161, 187-188, 198-199, 207-208; Ex 3 Bousley Tr., 92-93, 105, 155, 169-171, 186. At least one teacher was a fresh graduate of Tisch Asia. Ex 37, Basso Tr., 140-141. In some cases, lectures, even entire courses were taught over Skype or by e-mail correspondence. Ex 37, Basso Tr., 76-77, 105-106, 113-114, 190, 210-211; Ex 38, Hartman Tr.,

---

[20] Campbell referred to it as the "Spike Lee course." Every student tried to get in to the course. Ex 9, Campbell Tr., 301. Those who could not enroll were invited to sit in.
[21] *See*, e.g., 2011-2013 Bulletin; Tisch Asia website:
https://web.archive.org/web/20100430014746/http://www.tischasia.nyu.edu.sg/page/about.html
https://web.archive.org/web/20081003120137/http://www.tischasia.nyu.edu.sg/object/filmchairmessage.html;
https://web.archive.org/web/20121105052049/http://www.tischasia.nyu.edu.sg/object/TischAsiaFAQ.html.

182; Ex 39, Villa Ruiz Tr., 219. ███████████████████████

███████████████████████████████████████████████

Tisch NY faculty could easily transfer to Singapore whereas NYU required Tisch Asia

faculty to apply for employment in New York as if they were new hires. Ex 5, Shirazi Tr., 121.

For example, Wendy Hammond who taught multiple writing courses at TA for the entire

duration of the Tisch Asia program was asked to apply for a position at Tisch NY, and was only

accepted as an adjunct professor. Ex 22, Hammond Tr., 20.

Due to financial issues, and difficulty recruiting faculty, Tisch Asia adopted an

"overload" policy – *i.e.*, the maximum course load for faculty established in New York was

abandoned and existing faculty were given additional courses to teach. Ex 45. This stretched

faculty too thin and required faculty to go beyond their specialties. Ex 22, Hammond Tr., 19.

Tisch Asia students were also taught several courses by the same faculty members.[22] Ex

22, Hammond Tr., 129-130. As a result, Tisch Asia students were exposed to fewer perspectives,

and to the extent that one of the goals of the Tisch program was to make connections with

industry professionals, they had fewer opportunities to do so. In addition, students were stuck

with the same faculty even if they did not believe they were learning from that faculty member.

*See* Ex 39, Ruiz Tr., 106. In New York, students often had choices of faculty.

In contrast, there was little stability in the department chairs as you would hope for in an

established institution. Ex 46, Deposition Transcript of Michael Burke, 233-34, 240.

### 3.    Facilities

When it announced the opening of Tisch Asia, NYU promised that the school would be

"equipped with state-of-the-art technology and production facility…" and that it would "feature

---

[22] Fewer students meant fewer faculty. Ex 22.

the same outstanding production resources as those at the New York campus."[23] The facilities in Singapore, however, were substandard and nowhere near equal to those in New York. Ex 37, Basso Tr., 261-263; Ex 3, Bousley Tr., 64-66, 70, 100-101, 209; Ex 38, Hartman Tr., 82-84, 137, 158-159. Initially, the school had no cafeteria or elevator and classes were frequently interrupted by noise from construction activity. Ex 3, Bousley Tr., 64-66. Likewise, the equipment at Tisch Asia was also inferior to the equipment available to the students in New York. For example, at least during the years of 2007 through 2010, Film students at Tisch Asia had to shoot films using consumer electronics not used by film industry professionals and classes were taught with handicams that could have been purchased at Wal-Mart. Ex 3, Bousley Tr., 66; Ex 2, at Bousley 171-173, 176-177, 197.

### 4. Career Development

In addition, Tisch Asia students did not have an opportunity to gain the same or even comparable internships, part-time jobs in the industry or other resume building opportunities; enter into certain important artistic contests and festivals; or avail themselves of the networking opportunities crucial to the art world, which Tisch NY students had access to through New York faculty connections and significantly wider Tisch NY's exposure to Hollywood and important figures in the film industry. Ex 47, Ex 48.

Tisch Asia students also lacked the career development opportunities made available to Tisch NY students. Ex 37, Basso Tr., 85; Ex 3, Bousley Tr., 199-201; Ex 38, Hartman Tr., 70-73, 75, 102-104, 109 254-255, 265; Ex 39, Villa Ruiz Tr., 122, 134-135. Tisch Asia lacked the funds to proceed with career development initiatives. Ex 5 Shirazi Tr., 193. ████████████████

---

[23] https://www.nyu.edu/about/news-publications/news/2006/december/nyus_tisch_school_of.html

███████████████████████████████████████████████████

████ Ex 49, Deposition Transcript of Adam Underhill., 69.

### 5.      Scholarships

Shirazi lamented that recruitment for Tisch Asia was made more difficult by the fact that TA did not have access to the same scholarships that were available to Tisch NY. Ex 50, Ex 22 Hammond Tr., 18; Ex 3, Bousley Tr., 100-101; Ex 2, at Bousley 173, 239. Certain grants, such as the Academy Grant, were not available to TA students. Ex 51; *see also* Answer at Par. 44 (Docket 29).

### 6.      Admissions

Given the difficulty Tisch Asia faced with enrollments, it was forced to invoke strategies such as ████████████████████████████████████████████████

████████████████████████ (Ex 53), and turning interviews into "recruitment calls." Ex 3, Bousley Tr., 45. In addition, the acceptance rate at Tisch Asia was ten times greater than the rate in New York. Ex 33, Juliano Tr., 136.

### 7.      Differences in Curriculum

While there was certainly overlap in the curricula of the Tisch Asia and Tisch NY, they were not identical. *See* Am Cplt Par 45-50 (Docket 22); Answer at ¶¶ 47 and 49. (Docket 29); Ex 22 Hammond Tr., 166-68.

### 8.      Internships

There were far more internship opportunities in New York than Singapore. For example, Shirazi testified that there were 2000 internships in New York as opposed to maybe 10 in Singapore. Ex 5, Shirazi Tr., 244-45. Tisch NY was a 60-year-old program while Singapore was new and had no film industry. Ex 5, Shirazi Tr., 274. Unfortunately, NYU did little to address the discrepancy.

16

Indeed, the promise of professional development made on the Tisch Asia website[24] bore no resemblance to the experience of Tisch Asia students. Ex 37, Basso Tr., 85; Ex 3, Bousley Tr., 199-201; Ex 38, Hartman Tr., 70-73, 75, 102-104, 109, 212; Ex 39, Villa Ruiz Tr., 122, 134-135

### G.   Closure Announcement

The insurmountable financial struggles of Tisch Asia led to its inevitable announcement of its closure in the fall of 2012, well into the fall semester. As Campbell testified, "it was a business decision" to close Tisch Asia. Ex 9 Campbell Tr., 17. NYU was far more interested in its Abu Dhabi and Shanghai campuses, where it made money. Ex 16, Sexton Tr., 102.

The announcement led to chaos among both students and faculty. Ex 46, Burke Tr., 194; Ex 37, Basso Tr., 73-74, 256-257. Rather than being able to focus on their studies, the students mobilized to ensure that they could complete their degrees. Ex 2, at Bousley 188, 269. Faculty began searching for jobs and leaving. Ex 22, Hammond Tr., 14. Obviously, Tisch NY was not experiencing the same turmoil.

Typical of its approach with Tisch Asia in general, NYU did not have a plan in place for the wind down of the program when it announced the closure. It fell to the students to make the best of a terrible situation.[25] ███████████████████████████████████████████
███████████████████████████. Some students were forced to take classes by Skype

---

[24] *See* Amended Complaint ¶ 23 ("The intent of the third year is to bridge the academic and professional arenas. To this end, we have instituted internships, mentorships and work projects from hundreds of media related companies here in the tri-state area.")

[25] In contrast to the whitewash by the NYU administrators in their testimony, Wendy Hammond, a faculty member at Tisch Asia for the length of the entire program described the atmosphere as follows: ████████████
█████████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████████
███████████ Ex 22, Hammond Tr., 163

(something the students were not pleased with) because of the departure of Tisch Asia faculty. Ex 22, Hammond Tr., 148.

The testimony from the NYU and Tisch administration regarding the closing was shameful. Mary Schmidt Campbell, the former Dean of Tisch NY and the Chairman of the Board of Directors of Tisch Asia (!) could not recall the most basic details including: whether there is a document evidencing decision to close Tisch Asia (Ex 9, Campbell Tr., 10); the events that led to closing (Ex 9, Campbell Tr., at 11-12); the reason why Singapore/EDB would not fund Tisch Asia (Ex. 9, Campbell Tr., 15); why the joint program with the National University of Singapore never materialized – or even if NYU was in favor of that program (Ex 9, Campbell Tr., 26); and why negotiations with The Singaporean Economic Development Board ended (Ex 9, Campbell Tr., 27). She claimed she did not even ask anyone why the Singapore government ended its funding. Ex 9, Campbell Tr., 28.

President John Sexton, who was brought in at the end to negotiate with the Singapore government, was no better. *See* Ex 16, Sexton Tr., 154 (testifying that after all the negotiations, Singapore government gave no reason for withdrawing support and that was seemingly acceptable to him). Even David McLaughlin, the former Provost, was at a loss to explain why Singapore would not support the plan. Ex 15, McLaughlin Tr., 153, 193. Whether these senior level administrators' failure to recall is genuine or not, their disdain for Tisch Asia certainly is.

## H.   Class Representatives

Plaintiff Anna Basso received her MFA degree in Dramatic Writing from Tisch Asia in 2014. Ms. Basso paid approximately $100,000 in tuition for attending Tisch Asia. Ms. Basso initially applied to Tisch NY but was not accepted. She was invited to apply to Tisch Asia and was accepted. Ms. Basso reviewed the Tisch Asia website and relied on the representations that

18

the programs in NY and Singapore were the same. Ex 37, Basso Tr., 34-36, 126-127.[26]

Plaintiff Amy Hartman was enrolled and attended Tisch Asia's Film program from 2010 through 2012. Ms. Hartman paid approximately $100,000 in tuition for attending Tisch Asia. Ms. Ms. Hartman reviewed the Tisch Asia website and relied on the representations that the programs in NY and Singapore were the same. Ex 38, Hartman Tr. 154-155, 258.

Plaintiff Jaime Villa Ruiz received his MFA degree in Film from Tisch Asia in 2014. Mr. Villa Ruiz paid approximately $165,000 in tuition for attending Tisch Asia. Mr. Ruiz reviewed the Tisch Asia website and relied on the representations that the programs in NY and Singapore were the same. Ex 39, Ruiz Tr., 36-37.

## IV.   PROCEDURAL HISTORY

Plaintiffs filed their Complaint on September 20th, 2016 and filed their Amended Complaint on January 6th, 2017. Defendant moved to dismiss December 8th, 2016, and on the Court sustained Plaintiffs claims for breach of contract, negligent misrepresentation and unjust enrichment and dismissed Plaintiffs claims for GBL 349 and for breach of the covenant of good faith and fair dealing. Discovery closed on in June 2018.[27]

## V.   ARGUMENT

### A.   Elements of Rule 23(a) and (b)(3) and Applicable Standards

A party moving for class certification must meet the requirements of Rule 23(a) and, in addition, show that the action can be maintained under Rule 23(b)(1), (2), or (3). *Brown v. Kelly*, 609 F.3d 467, 475-76 (2d Cir. 2010). The requirements of Rule 23(a) are satisfied if:

---

[26] Stephanie Bousley, a former Tisch Asia student who was deposed by NYU also testified regarding NYU's representations that the Asia and NY programs were the same. Ex 3, Bousley Tr., 30,33.
[27] By agreement, one witness, Spike Lee, will answer written questions in lieu of deposition, and has yet to do so. The parties have also submitted a dispute regarding documents withheld on privilege grounds to Judge Fox.

> (1)    The class is so numerous that joinder of all members is impracticable;
>
> (2)    There are questions of law or fact common to the class;
>
> (3)    The claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4)    The representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Rule 23 also contains an implicit ascertainability requirement that, in the Second Circuit, "asks district courts to consider whether a proposed class is defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec. Litig.*, 862 F.3d 250, 269 (2d Cir. 2017).

Plaintiffs move for certification under Rule 23(b)(3). Certification under subsection 23(b)(3) is warranted if questions of law or fact "predominate over any questions affecting only individual members," and class resolution will be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Class certification is proper if "'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'" *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). As the Second Circuit Court of Appeals explained in *In re Initial Pub. Offering Sec. Litig. ("In re IPO")*:

> The Rule 23 requirements are threshold issues, similar in some respects to preliminary issues such as personal or subject matter jurisdiction. We normally do not say that a district court makes a "finding" of subject matter jurisdiction; rather, the district court makes a "ruling" or a "determination" as to whether such jurisdiction exists . . . . The same approach is appropriate for Rule 23 requirements. For example, in considering whether the numerosity requirement is met, a judge might need to resolve a factual dispute as to how many members are in a proposed class.

471 F.3d 24, 40 (2d Cir. 2006).

While a district court should resolve any disputed factual issues necessary to making its determination that the requirements of Rule 23 have been satisfied, the "district court should not assess any aspect of the merits unrelated to a Rule 23 requirement." *Id.* at 41; *see also Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1195 (2013) ("Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.").

As demonstrated below, class certification is appropriate here.

**B.      The Class Is Ascertainable and The Requirements of Rule 23(a) Are Readily Met**

**1.      The Class Is Ascertainable**

The Second Circuit does not have a "heightened" requirement of ascertainability, it only requires that a "class be defined using objective criteria that establish a membership with definite boundaries," and does not require "administrative feasibility" of identifying each class member based on that objective criteria. *In re Petrobras Sec.*, 862 F.3d at 266. Rather, ascertainbility imposes only a "modest threshold requirement" that asks only "whether a proposed class is defined using objective criteria that establish a membership with definite boundaries." *Id.* at 269. It "will only preclude certification if a proposed class definition is indeterminate in some fundamental way." *Id. See also In re Libor-Based Fin. Instruments Antitrust Litig.*, 11 MD 2262 (NRB), 2018 U.S. Dist. LEXIS 33640, at *89-90 (S.D.N.Y. Feb. 28, 2018) (same).

Here, a person is a member of the Class if they were a student at Tisch Asia. Class membership can be easily and objectively determined based on NYU enrollment records. Accordingly, the proposed class definition here is based on objective criteria and therefore meets the implied requirement of ascertainability.

### 2. The Proposed Class Satisfies Rule 23(a)

#### a. The Proposed Class Is Sufficiently Numerous

The first requirement under Rule 23(a) is that the class must be "so numerous that joinder is impracticable." Fed. R. Civ. P. 23(a)(1). "'Impracticable,' in this context, does not mean impossible; instead Rule 23(a)(1) only requires that, in the absence of a class action, joinder would be 'simply difficult or inconvenient.'" *Assif v. Titleserv, Inc.*, 288 F.R.D. 18, 23 (E.D.N.Y. 2012) (citations omitted); *see also Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993) ("Impracticable does not mean impossible."); *Nw. Nat'l Bank of Minneapolis v. Fox & Co.*, 102 F.R.D. 507, 510 (S.D.N.Y. 1984) (numerosity requires that the court "find that the difficulty or inconvenience of joining all members of the class makes class litigation desirable") (citations omitted). Additionally, "Courts have not required evidence of exact class size or identity of class members to satisfy the numerosity requirement." *Robidoux*, 987 F.2d at 935.

It is estimated that the Class consists of over 300 Tisch Asia students. *See* NYU0022434; NYU0003779; NYU0004048. Given that "courts within the Second Circuit generally presume that joinder of all putative class members is impracticable if the class has more than forty members," *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 99 (E.D.N.Y. 2012), this easily satisfies the numerosity requirement. *See also Robidoux*, 987 F.2d at 935-36 (class size of 40 or more may satisfy numerosity). Numerosity is not expected to be a contested issue.

#### b. There Are Common Questions of Law or Fact

The second requirement of Rule 23(a) is the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To establish commonality, a plaintiff must identify an issue of fact or law whose resolution "is central to the validity of each" class member's claim. *Wal-Mart*, 131 S. Ct. at 2551. "The common question must lend itself to 'classwide resolution' such that 'determination of its truth or falsity will resolve an issue that is

22

central to the validity of each one of the claims in one stroke.'" *Sykes v. Mel Harris & Assocs. LLC*, 285 F.R.D. 279, 286 (S.D.N.Y. 2012) (quoting *Wal-Mart*, 131 S. Ct. at 2551). The requirement is satisfied by "the capacity of a class wide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart*, 131 S. Ct. at 2551 (internal citation, emphasis and quotation marks omitted). "[E]ven a single common question" will suffice to establish commonality. *Id.* at 2556 (internal quotation marks omitted); *see also Brown*, 609 F.3d at 475 ("commonality requirement is met if there is a common question of law or fact shared by the class"); *Vitamin C Antitrust Litig.*, 279 F.R.D. at 99 ("A single common question of law or fact may suffice to satisfy this requirement if the question is capable of giving rise to a common answer through a class action."). "'[T]he individual circumstances of the class members can differ without precluding class certification,' so long as 'the common questions are at the core of the cause of action alleged.'" *Assif*, 288 F.R.D. at 23 (citations omitted).

This case involves a number of core common questions of law and fact, including the following:

    (a)    Whether Defendant failed to disclose material facts regarding the differences between Tisch Asia and Tisch NY programs to the Plaintiffs and other similarly situated class members;

    (b)    Whether Defendant breached their contract to provide certain educational benefits and services to the Plaintiffs and other similarly situated class members;

    (c)    Whether Defendant intentionally and/or negligently misrepresented that they would provide certain educational benefits and services to the Plaintiffs and other similarly situated class members which they failed to do;

(d)     Whether Defendant concealed that Tisch Asia was a five-year experiment from

the Plaintiffs and other similarly situated class members; and

(d)     Whether Defendant was unjustly enriched by promising to provide but failing to

deliver certain educational benefits and services to the Plaintiffs and other

similarly situated class members.

These common questions are central to the litigation, and the answers to these questions

will be fundamental to the resolution of the case. Accordingly, the commonality requirement is

satisfied. *See Stinson,* 282 F.R.D. at 369 (finding commonality where plaintiffs "alleged that they

were victims of a pattern and practice set and enforced by city officials") (*citing Daniels v. City

of N.Y.*, 198 F.R.D. 409, 417 (S.D.N.Y. 2001) ("The fact that the claims of the proposed class

stem from the same alleged unconstitutional conduct of the defendants proves the existence of

common questions of law or fact.")).

### c.     Plaintiffs' Claims Are Typical of Those of Other Class Members

The claims of the class representative must be "typical" of the claims of the class. Fed. R.

Civ. P. 23(a)(3). Typicality "is satisfied when each class member's claim arises from the same

course of events, and each class member makes similar legal arguments to prove the defendant's

liability." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (citations omitted). "The

typicality analysis focuses on whether the named plaintiff's interests align with the interests of

the rest of the class." *Vitamin C Antitrust Litig.*, 279 F.R.D. at 105. "The purpose of this analysis

is to ensure that, by prosecuting its own case, the named plaintiff simultaneously advances the

interests of the absent class members.'" *Id.* (citations omitted). Typicality "does not require

complete symmetry between the class representative's claims and those of the absent class

members, but "[r]ather, the named plaintiff must simply raise claims that 'arise from the same

course of events' as the class claims and make 'similar legal arguments to prove the defendant's liability.'" *Id.* (citations omitted); *See Stinson,* 282 F.R.D. at 371 (finding typicality where "proposed class representatives are New Yorkers who have all allegedly been issued as least one summons without probable cause and suffered injury as a result of an alleged unconstitutional NYPD practice").

As former students of Tisch Asia, Plaintiffs are typical of the Class. Plaintiffs had the same contract, and were subject to the same misrepresentations and omissions as the other members of the Class.

Accordingly, the requirement of typicality is satisfied.

### d.    Adequacy Is Satisfied

The final requirement of Rule 23(a) is that the representative party must fairly and adequately represent the interests of the class. Fed. R. Civ. P. 23(a)(4). Adequacy is a two-pronged analysis: (1) the named plaintiff must not have claims antagonistic to or in conflict with other class members, and (2) class counsel must be qualified, experienced, and generally able to conduct the litigation. *See Marisol A.*, 126 F.3d at 378.

As to the first prong, "[i]n order to defeat a motion for certification, . . . the conflict 'must be fundamental.'" *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (citations omitted); *see also Joel A. v. Guiliani*, 218 F.3d 132, 139-40 (2d Cir. 2000) (no "obvious conflict" found); *Vitamin C Antitrust Litig.*, 279 F.R.D. at 102 ("[A] conflict of interest will not destroy adequacy under Rule 23 unless the conflict is 'fundamental' and concrete; conflicts which are merely "speculative  . . . should be disregarded at the class certification stage.'" (citations omitted)).

Here, Plaintiffs' interests do not conflict with those of the absent class members, Plaintiffs do not have any interests antagonistic to those of the other class members, and

Plaintiffs are committed to the vigorous prosecution of this action. "The fact that plaintiffs' claims are typical of the class is strong evidence that their interests are not antagonistic to those of the class; the same strategies that will vindicate plaintiffs' claims will vindicate those of the class." *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 158 (S.D.N.Y. 2008). Plaintiffs interests are aligned with other class members, as they seek damages for Defendant's unlawful failure to disclose the fact that Tisch Asia was an experimental fragile 5-year project as opposed to the renowned and robust Tisch NY school and failure to provide the same program as Tisch NY. This prong of the adequacy requirement is met.

As to the second prong, Plaintiffs are represented by experienced and able counsel who are highly experienced in handling class actions, particularly large complex class actions involving complicated legal and factual issues. *See* Ex 54 Firm Resumes, attached as Exhibits hereto. Since counsel have pursued this matter vigorously and competently on behalf of Plaintiffs and all other members of the putative class, the second prong of 23(a)(4) analysis is satisfied. *See Marisol A.*, 126 F.3d at 378 ("Rule 23(a)(4) requires that plaintiffs demonstrate that class counsel is qualified, experienced, and generally able to conduct the litigation.") (internal quotation marks and citation omitted).

### C.      The Requirements of Rule 23(b)(3) Are Met

Rule 23(b)(3) requires a finding of "predominance" and "superiority"; *i.e.*, a finding that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In determining whether these requirements have been met, the court should consider the issue of manageability, which is "peculiarly within a district court's discretion." *Seijas v. Republic of Arg.*, 606 F.3d 53, 58 (2d Cir. 2010).

26

1.   **Common Questions of Law or Fact Predominate as To Plaintiffs' Claim**

"The predominance requirement is satisfied 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013) (citations omitted), *cert. denied*, 134 S. Ct. 1938 (2014). The purpose of the predominance inquiry is to allow the Court to determine whether proposed classes are "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. v. Windsor*, 521 U.S. 591, 623 (1997); *accord Brown*, 609 F.3d at 476; *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006). The predominance test "asks whether a class suit for the unitary adjudication of common issues is economical and efficient in the context of all of the issues in the suit." 2 A. Conte & H. Newberg, Newberg on Class Actions § 4.25, p. 156 (4th ed. 2002). "Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen*, 133 S.Ct. at 1191.

Here, there are numerous common questions of law or fact, *see* Section III.B.2.a, above, that predominate over any issues affecting only individual class members. The predominant common question in this case is whether Tisch Asia was the same program as Tisch NY. Because "Rule 23 seeks greater efficiency via collective adjudication and, relatedly, greater uniformity of decision as to similarly situated parties," the Second Circuit has stated "that when plaintiffs are 'allegedly aggrieved by a single policy of defendants,' such as the blanket policy at issue here, the case presents 'precisely the type of situation for which the class action device is suited' since many nearly identical litigations can be adjudicated in unison.'" *Nassau Cnty. Strip*

*Search Cases*, 461 F.3d at 228 (citations omitted); *see also Stinson*, 282 F.R.D. at 383

("Plaintiffs in this action present a common theory of liability involving an NYPD policy of

issuing summonses to individuals without probable cause in response to a quota requirement.

Because the potential plaintiffs' claims brought under this theory involve sufficient common

issues of law and fact subject to generalized proof, the predominance requirement of Rule

23(b)(3) is fulfilled.").

       The resolution of Plaintiffs' claims will establish Defendant's liability for its

misrepresentations and omissions as to all members of the Class. *See Markaeff v. Trump*

*University, LLC,* 309 F.R.D. 631, 643 (S.D.CA. 2015) ("A class action has the ability to

determine on a class wide basis whether misrepresentations were made and whether they were

material."). Although the amount of individual damages may vary, a common methodology can

be used to determine damages. Plaintiffs claim they would not have attended Tisch Asia but for

the misrepresentations of NYU. To the extent Defendant wishes to argue that the members of the

Class received something of value and should not get a full refund, it may do so. But that does

not defeat class certification. *See Markaeff v. Trump University, LLC*, 309 F.R.D. 631, 643

(S.D.CA. 2015) (decertification decision). Alternatively, a jury can decide the amount of

reimbursement to each class member of the portion of the tuition paid based on the jury's

evaluation of the value of Tisch Asia program. *See generally*, *In re Nigeria Charter Flights*

*Contract Litig.*, 233 F.R.D. 297, 305 (E.D.N.Y. 2006)*; see also In re Visa Check/MasterMoney*

*Antitrust Litig.*, 280 F.3d 124, 139 (2d Cir. 2001) ("Common issues may predominate when

liability can be determined on a class-wide basis, even when there are some individualized

damage issues."), *superseded on other grounds by rule*, Fed. R. Civ. P. 23(g), *as stated in*

*Attenborough v. Const. & Gen. Bldg. Laborers' Local 79*, 238 F.R.D. 82, 100 (S.D.N.Y. 2006).

Accordingly, the requirement of predominance is satisfied.[28]

### 2.   A Class Action Is the Superior and Most Efficient Method for Adjudicating This Action

Rule 23(b)(3) provides that certification is warranted if a class-wide trial is "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). "Rule 23(b)(3) class actions can be superior precisely because they facilitate the redress of claims where the costs of bringing individual actions outweigh the expected recovery." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d at 130. "Other factors relevant to a finding of superiority include the manageability of a class action and the desirability of litigating the claims in a particular forum." *Vitamin C Antitrust Litig.*, 279 F.R.D. at 110; *see also* 5 J. Moore et al., Moore's Federal Practice - Civil § 23.46[1] (3d ed. 2011) ("In determining superiority, courts must consider alternative methods of adjudicating the dispute. Superiority is determined by comparing the efficiency and fairness of all available methods of adjudicating the matter.").

Here, class certification is far more fair and efficient than any other procedure available for resolving the factual and legal issues raised by Plaintiff's claims. Denying certification would potentially lead to duplicative and wasteful litigation because the core issue in the case— common to all class members—is whether Defendant misrepresented to Tisch Asia students that Tisch Asia and Tisch NY were equal programs. Such conduct impacted hundreds of Tisch Asia students. At the same time, in the absence of certification, it is likely that many class members would not pursue their claims based, not on a lack of underlying merit, but rather on the size of their potential recovery measured against the high cost of litigation and effort required to pursue their claims. By combining all of class members' claims challenging Defendants' uniform

---

[28] There are no choice of law issues here that would defeat predominance. On the motion to dismiss, the parties only briefed New York law, and the Court applied New York law to Plaintiffs' claims. *See* Docket 27.

misrepresentations and omissions, those claims are presented far more fairly and efficiently than

they would be in individual actions, which would require the same issues to be litigated multiple

times. *See Stinson*, 282 F.R.D. at 383 ("Plaintiffs' claims allege a single unconstitutional

practice, making class certification especially appropriate . . . [and] a superior means of

adjudicating Plaintiffs' claims.").

## VI.    CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court grant their Motion

for Class Certification.

Dated: July 9, 2018                         Respectfully submitted,


                                            /s/ Oren Giskan
                                            Oren Giskan

                                            **GISKAN SOLOTAROFF & ANDERSON LLP**
                                            217 Centre Street - 6th Floor
                                            New York, NY 100013
                                            Telephone: (212) 847-8315

                                            **SCHWARTZ, PONTERIO & LEVENSON, PLLC**
                                            134 West 29th Street – Suite 1006
                                            New York, New York 10001
                                            Telephone: (212) 714-1200

                                            *Attorneys for Plaintiffs and the Proposed Class*