```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/30/2020
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
ANNA BASSO, AMY HARTMAN, and JAIME :
VILLA RUIZ,                        :
                                   :
           Plaintiffs,             :
                                   :        16 Civ. 7295 (VM)
      - against -                  :
                                   :
NEW YORK UNIVERSITY,               :        **DECISION AND ORDER**
                                   :
           Defendant.              :
-----------------------------------X
**VICTOR MARRERO, United States District Judge.**

Plaintiffs Anna Basso, Amy Hartman, and Jaime Villa Ruiz ("Plaintiffs" or "Named Plaintiffs"), on behalf of themselves and other similarly situated individuals, bring this action against New York University ("NYU") alleging that NYU misrepresented the quality of education and opportunities at the Tisch School of the Arts ("Tisch New York") campus in Singapore ("Tisch Asia"). Now before the Court is NYU's Motion for Summary Judgment pursuant to Federal Rules of Civil Procedure 56 ("Federal Rules"). (See "Motion," Dkt. No. 122.) For the reasons stated herein, the Court grants the Motion.

## I.   BACKGROUND

### A.   PROCEDURAL BACKGROUND

This Order assumes familiarity with the Court's prior Orders partly granting NYU's motion to dismiss the First Amended Complaint and granting Plaintiffs' motion for class certification. See Basso v. N.Y. Univ. (Basso I), 16 Civ.

1

7295, 2017 WL 1019505 (S.D.N.Y. Feb. 24, 2017); see also Basso v. N.Y. Univ. (Basso II), 363 F. Supp. 3d 413 (S.D.N.Y. 2019).

Plaintiffs commenced this action in September 2016. In brief, Plaintiffs allege that NYU induced students to enroll at Tisch Asia -- a performing-arts-focused graduate school in Singapore affiliated with Tisch New York, which opened in 2007 and closed in 2015 -- by representing that Tisch Asia would offer an educational experience equal to NYU's renowned Tisch School of the Arts in New York City. Plaintiffs allege that "except for the cost of tuition, Tisch Asia never lived up to the standards of Tisch New York," and "Tisch Asia students were not provided with the same education, professional training, and equipment as their New York counterparts." ("First Amended Complaint," Dkt. No. 22 ¶¶ 4-5.)

Plaintiffs' First Amended Complaint asserted seven causes of action on behalf of the putative class: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) violation of the New York General Business Law ("G.B.L.") Section 349; (4) violation of G.B.L. Section 350; (5) negligent misrepresentation; (6) fraud; and (7) unjust enrichment. By Order dated February 24, 2017, the Court dismissed Counts (2), (3), and (4). See Basso I, 2017 WL 1019505, at *7.

Following the close of discovery in June 2018, Plaintiffs moved to certify a proposed class, pursuant to Federal Rule 23 (b)(3), consisting of all students who attended Tisch Asia. Plaintiffs moved to certify the class as to all claims except the breach of contract claim. The Court granted that motion. NYU then filed the present Motion, to which Plaintiffs submitted opposition.

B.   FACTUAL BACKGROUND[1]

1. PLANNING AND DEVELOPMENT OF TISCH ASIA

In 2002, Pari Shirazi ("Shirazi"), former President of Tisch Asia, conceived of the idea of an international campus for Tisch New York. Shirazi was then serving as Vice Dean of Tisch and oversaw all of Tisch's international programs. NYU's senior leadership at the time included former NYU President (and current President Emeritus) John Sexton ("Sexton") and former Provost David McLaughlin ("McLaughlin"), among others.

---

[1] Except as otherwise noted, the following background derives from the undisputed facts as set forth by the parties in NYU's Local Rule 56.1 Statement of Undisputed Facts and Plaintiffs' responses thereto. (See "NYU SUMF," Dkt. No. 125; "Plaintiffs' Corrected Resp. and Counterstatement," Dkt. No. 141.) The Court has also considered the full record submitted by the parties, including the following frequently cited declarations and exhibits: the "Volpe Decl.," Dkt. No. 124; the "Giskan Decl.," Dkt. No. 142. No further citations to the record will be made herein except as specifically cited. The Court construes any disputed facts discussed in this section and the justifiable inferences arising therefrom in the light most favorable to the nonmovant for each motion, as required under the standard set forth in Section II below.

Shirazi favored Singapore for the location of the Tisch Asia campus. Discussions between Tisch and the Singaporean government about establishing an arts program in Singapore began sometime in either late 2005 or early 2006. The Singaporean government represented to Mary Schmidt Campbell ("Campbell"), Dean of Tisch at the time, that its interest in such a program was part of a larger vision that it had for the nation, with the understanding that Singapore would provide substantial support for NYU's endeavor.

Shirazi and Campbell were responsible for supervising the early planning stages of Tisch Asia. NYU contends that they considered both undergraduate and graduate programs, with the goal of ultimately developing a sustainable academic institution. Plaintiffs contend that the program would have been sustainable only with the inclusion of an undergraduate program, and the original plan included such a program.

Shirazi and Campbell eventually presented an initial proposal for Tisch Asia to McLaughlin that included both graduate and undergraduate programs, but McLaughlin rejected the plan. Shirazi and Campbell continued preparing a proposal. The groundwork included financial planning as well as developing a statement of the program content, and plans for a curriculum, faculty staffing, recruiting, the size and

location of the campus, and other details. They shared the proposal with senior NYU leadership.

The parties dispute whether the Tisch Asia program was designed to be of similar quality and experiential value as Tisch New York. NYU contends that it designed Tisch Asia to offer graduate film programs of the same quality as Tisch New York, and to confer identical degrees on students as those at Tisch New York. Plaintiffs, however, contend that Tisch Asia differed from Tisch New York in significant ways, including in the quality and experience of teachers, the quality of physical facilities and equipment, and the prospects for a continuing existence. Plaintiffs note that, initially, Tisch Asia had no cafeteria or elevator and that classes were frequently interrupted by construction noise. With regard to equipment, Tisch Asia students were taught with hand-held cameras like those available at Walmart and had to shoot films using consumer devices not used by industry professionals.

NYU contends that, during the planning process, Sexton focused on making the Tisch Asia program sustainable and financially sound. NYU further contends that any concerns in this regard were addressed through Sexton's meetings with Shirazi and Campbell. Plaintiffs argue that there is no evidence that Sexton was assured of the Tisch Asia program's financial viability and sustainable quality. Plaintiffs claim

that, after one year, the unsustainability of Tisch Asia's financial model was apparent.

While NYU was developing plans for Tisch Asia, Shirazi and NYU senior leadership engaged in negotiations with the Singaporean government regarding real estate, financial aid, loans, and academic freedom. The Singaporean government was enthusiastic about the program and agreed to provide campus space to NYU at a discounted lease rate. The parties dispute whether the lease term was ten years or five years with the possibility of an extension conditioned on Tisch Asia operating an undergraduate program with a university in Singapore. The Singaporean government also provided a $7 million loan to cover renovations of a television studio on campus and a $2.3 million grant to fund operating deficits typical in the first years of new academic programs. According to Plaintiffs, this funding was not enough to cover the planned construction and renovation, which grossly underestimated certain costs. Further, according to Plaintiffs, the building was not suited to the program, for example because it lacked an elevator.

After reaching an agreement with the Singaporean government, NYU's senior leadership approved a Tisch Asia graduate program and financial plan. Sexton approved the plan based on his trust in Campbell and a belief that the program

would be financially viable with a combination of tuition, financial support from the Singaporean government, and private donations. Sexton and McLaughlin presented the Tisch Asia proposal to NYU's Board of Trustees (the "Board"). The Board approved the Tisch Asia plan in December 2006. Following Board approval, a Tisch Asia Board of Directors formed, and preparations for Tisch Asia's first student class -- namely, construction and development of a curriculum, faculty, and administration -- began.

Tisch Asia opened in the fall of 2007, with actor Jackie Chan appearing at the ribbon-cutting ceremony. Shirazi testified that, at the time, NYU was not aware that the Singaporean government imposed a seven percent tax on tuition payments. After learning of this tax, Shirazi negotiated a grant from the Singaporean government to cover the tax for five years. Plaintiffs characterize the tax situation as a "ticking time bomb." (Plaintiffs' Corrected Resp. and Counterstatement at Statement 35.)

The parties dispute whether NYU expected Tisch Asia to generate a profit for NYU. According to NYU, the university expected that Tisch Asia would only break even. According to Plaintiffs, however, McLaughlin expressed concern about whether Tisch Asia would financially benefit Tisch New York, and members of NYU senior leadership testified that Tisch

Asia was expected to be self-sustaining. Neither Tisch New York nor Tisch Asia is financially self-sustaining; both rely on government funding, private donations, and university support.

    2.   THE TISCH ASIA PROGRAM

The Tisch Asia graduate program drew students from countries in Asia, the United States, and many other parts of the world. Tisch Asia offered courses with the same titles as courses offered at Tisch New York, and both schools conferred a Master of Fine Arts. In some instances, Tisch Asia offered students electives that Tisch New York did not. Plaintiff Basso stated that she is unaware of any courses Tisch Asia promised but did not offer. Tisch Asia faculty included at least twelve professors who taught at Tisch New York.

Nonetheless, the parties dispute whether the programs offered students equally good faculty, facilities, and training in film and television. NYU contends that the Tisch Asia facilities and equipment were state of the art: that Tisch Asia students had better access to facilities and equipment than students in New York and used top of the line cameras (e.g., the Arri ALEXA and RED Epic). NYU further claims that camera quality is unimportant for first-year directing classes, in which the goal for students is to learn how to frame a shot. Plaintiffs, however, claim the cameras

available to students were not suited to the students'
purposes, that Tisch Asia's building lacked an elevator, and
that Tisch Asia provided no food service on campus for the
first six or seven months. There is no dispute that Tisch
Asia students were offered exposure to highly esteemed
filmmakers and artists, though Plaintiffs contend that such
opportunities were limited and, at times, remote.

The parties dispute whether NYU intended Tisch Asia to
grow and endure or considered it -- as Shirazi stated at a
February 2010 faculty meeting -- a "five-year project" that
the Trustees would, at the five-year mark, "review . . . and
see if [it] w[ould] continue." (Giskan Decl. Ex. 37.) NYU
maintains that its plan was to evaluate Tisch Asia after five
years to assess successes and potential improvements as part
of a Tisch practice of conducting periodic program
evaluations.

According to NYU, the university expected the
Singaporean government to extend its financial commitment to
Tisch Asia beyond its initial support. Plaintiffs, however,
claim that NYU misapprehended the financial support necessary
to sustain the program. In this regard, Plaintiffs point to
the renovation costs and Singapore's tuition tax, and they
further claim that Shirazi understood that Tisch Asia needed
an undergraduate program to be financially sustainable.

3.   <u>BUDGET ISSUES</u>

NYU asserts that Tisch Asia encountered budgetary problems because of a variety of issues, including unbudgeted faculty housing costs, a need for additional full-time faculty to teach aspects of the program that adjuncts or nonfaculty staff typically taught in New York, greater-than-expected renovation costs, and lower-than-planned enrollment. Additionally, when the financial support the Singaporean government had provided to cover the tuition tax ended, NYU decided to cover the students' obligation rather than pass the expense onto them. Finally, the 2008 global financial crisis resulted in a weakened exchange rate that increased the costs of running Tisch Asia.

NYU admits that the Tisch Asia Board of Directors identified a budget gap early on. The parties dispute how the university responded to the issue. Relying on Campbell's testimony, NYU insists that Tisch Asia administrators and, eventually, NYU senior leadership pursued different plans for remedying Tisch Asia's budget. NYU points out that it sought more subsidies from the Singaporean government,[2] diverted funding from Tisch New York, increased student recruitment

---

[2] At the request of Campbell, Sexton joined Campbell and Shirazi in negotiations with the Singaporean government.

and philanthropy efforts, created a website for Tisch Asia, and began offering continuing education programs.

Plaintiffs deny that NYU diverted significant funding from Tisch New York to Tisch Asia and characterize NYU's other efforts as occurring too late to make a difference. Plaintiffs further contend that the NYU Administration did not fully support Tisch Asia. Plaintiffs provide documents and testimony indicating that NYU viewed Tisch Asia as a *Tisch New York* project rather than a *university* project, and they argue that, as such, it did not benefit from university-level attention, planning, and support. Plaintiffs also observe that those involved in the negotiations with the Singaporean government --Sexton, Campbell, and Shirazi -- have not offered detailed explanations of why those negotiations failed.

In 2011, while negotiations with the Singaporean government were ongoing, NYU Vice Chancellor Richard Folley tasked Vice Provost Joseph Juliano ("Juliano") with developing a plan to improve Tisch Asia's finances. After an initial review confirmed that the program was operating at a significant deficit, Juliano took a team to Singapore in October 2011 to conduct a budget and operational review. Specifically, the review showed that from fiscal year 2007 through fiscal year 2012, Tisch Asia cost nearly $20 million

more than budgeted, and, going forward, it faced a $6.7
million annual deficit. The review attributed approximately
25 percent of the cost overrun to the weakened United States
dollar. Other contributing factors included greater
construction costs than were budgeted, lower-than-projected
enrollment, overspending on operations, and faculty
compensation. Although Tisch New York discretionary funds had
historically been used to cover Tisch Asia's budget gap, that
approach risked Tisch's financial stability and was not
sustainable over the long-term.

According to NYU, this variance between Tisch Asia's
budget plan and actual operations was greater than NYU
previously recognized. Plaintiffs deny that this result
constituted new knowledge, pointing out that McLaughlin and
Campbell were on Tisch Asia's Board and were well acquainted
with the program's financial challenges.

The Juliano review team's report, titled "Five Year
Review Report" and dated November 15, 2011, concluded that
"if [Tisch Asia] is going to be a going concern," it would
need to undergo "significant changes":

> Expenses need to be brought into line with the scale of
> the operation, and an enrollment strategy needs to be
> developed, based on a well-researched marketing plan and
> coordinated recruitment efforts with the New York
> programs. However, because reducing expenses and
> increasing enrollments will fall short of solving the
> structural deficit Tisch[] Asia will require additional

12

> governmental support if it is to avoid further
> subventions from TSOA. These discussions are currently
> underway . . . .

(Volpe Decl., Ex. H, at 4.) Without funding from the
Singaporean government, NYU covered Tisch Asia's budgetary
shortfalls.

Soon after issuance of the November 2011 report, NYU
removed Shirazi as President of Tisch Asia. A group of NYU
administrators -- including Juliano and Vice President for
Global Programs, Nancy Morrison -- took over to lead Tisch
Asia's operations. Campbell announced Shirazi's removal at a
town hall meeting with students in Singapore. At that event,
she expressed concern regarding Tisch Asia's financial
sustainability. Juliano and Morrison also met with students
to discuss the program's financial situation.

Meanwhile, and consistent with recommendations contained
in the November 2011 report, NYU continued negotiating with
the Singaporean government and pursuing philanthropic
opportunities and other approaches to resolve Tisch Asia's
budgetary issues. Juliano imposed stricter financial
controls.

NYU claims that the university's senior leadership
wanted to continue Tisch Asia in a financially sustainable
manner, including by starting a joint conservatory with the
National University of Singapore ("NUS"). In January 2012,

Juliano worked on a financial and operational model for the joint conservatory, which both NYU and NUS supported and planned to submit to the Singapore Economic Development Board ("EDB"). In Plaintiffs' view, this plan was, by that time, insufficient to restore Tisch Asia's financial position.

Nonetheless, Juliano met with the Singaporean government with the goal of obtaining more financial support for Tisch Asia, and in January 2012, he discussed with them the possibility of extending the lease for Tisch Asia's campus. Through the fall of that year, Juliano traveled to Singapore monthly to meet with NUS and EDB and oversee Tisch Asia's finances.

NYU contends that officials negotiating on behalf of the Singaporean government endorsed the proposed financial restructuring of Tisch Asia and the joint conservatory with NUS, but that the government's final decisionmakers rejected the proposal. According to NYU, Campbell was surprised when the Singaporean government declined to provide further financial support. Plaintiffs deny these contentions, citing Campbell's inability to testify to basic details, including why, if NYU had supported the joint conservatory, the project never materialized, why negotiations with the EDB ended, why Singapore would not fund Tisch Asia, and the events leading to Tisch Asia's closing. Plaintiffs do, however, admit that

Singapore's decision came as a surprise to Tisch Asia Associate Dean Michael Burke ("Burke").

The parties dispute why Tisch Asia became financially unsustainable. NYU attributes this outcome to the Singaporean government's discontinuance of financial support along with other financial issues. Plaintiffs agree that these were contributing factors but also ascribe NYU's failure to include an undergraduate program within Tisch Asia as a cause of Tisch Asia's failure.

After negotiations with Singapore ended, NYU decided to close Tisch Asia. Campbell, on behalf of Tisch Asia and in consultation with NYU senior leadership, made this decision. On November 8, 2012, Campbell announced a staged closure, which would involve suspending recruitment while permitting enrolled students to finish their degrees.

4.   CLOSURE

NYU contends that Campbell developed and monitored the progress of the closure plan. In so doing, she placed emphasis on providing students with clear and transparent messaging about the closure, as well as listening to and addressing student concerns. Juliano also made several trips to Singapore in 2013 to assist with the closure, and Tisch Asia received additional funds from NYU during that period.

NYU further claims that the closure plan ensured that students' education would not be disrupted. Plaintiffs dispute this claim, pointing out that some students were displeased that they had to take classes by Skype when certain Tisch Asia faculty members left Singapore.

The parties disagree over whether, because of the closure, Tisch Asia students lost class time and education quality. After the final Tisch Asia class graduated in the summer of 2015, NYU continued employing Tisch Asia faculty to supervise students' outstanding thesis projects. Burke assisted with this effort through the 2017 deadline for students in the final class to complete their thesis projects. Tisch Asia students finishing their thesis projects were allowed to use Tisch facilities in New York or Singapore.

After the November 2012 closure announcement, all first-year students were offered a tuition refund, with an April 1, 2013 deadline to accept the offer. Plaintiff Basso declined the offer because she had already finished nearly half of her two-year master's degree, wanted to continue working on her thesis script, and had been told that her thesis advisor was staying. But Basso's thesis advisor did not stay, leaving Tisch Asia mid-semester. Plaintiff Hartman was no longer enrolled at Tisch Asia when the closure was announced.

5.   <u>REPRESENTATIONS REGARDING TISCH ASIA</u>

NYU never specifically promised that Tisch Asia would always remain open. On Tisch Asia's website, a list of Frequently Asked Questions and answers ("FAQs") included the following:

> There are no differences between the education received in Singapore and the education received in New York. All programs that are in both New York and Singapore have the same number of students, identical curriculum, state of the art production facilities, and are taught by Tisch School of the Arts world-renowned faculty. Programs developed specifically for Singapore are accredited by New York University, staffed by NYU full-time faculty, and subject to the same artistic standards and high level of teaching excellence as any program at Tisch or Tisch Asia.

(Volpe Decl., Ex. CC, at NYU0020208.)

The website also contained a message from the Chair of the Graduate Film Program, David Irving ("Chair Letter"). As to internships and career counseling, the Chair Letter represented that "we have instituted internships, mentorships and work projects from hundreds of media related companies here in the tri-state area." (Id. at NYU0020211.) In this regard, the FAQs further stated:

> The Tisch Office of Career Development, is an active and useful resource for Tisch students and recent alumni. The office offers a range of services, such as individual career counseling specific to the arts, resume-writing assistance, consultations, interview coaching, a screenplay bank, and a job list serve.

(Id. at NYU0020209.) The Chair Letter further represented that "[a]ll faculty are working professionals" and stated:

> Tisch Graduate Film has trained some of the finest
> writers, directors, cinematographers, producers, and
> editors in the film industry. We will maintain this
> tradition in Singapore by insuring that the faculty,
> equipment, and facilities are of the same quality that
> have been established at the New York campus, and by
> implementing the curriculum, projects, and exercises
> that demand a level of rigor and exploration from you
> that is the hallmark of a Tisch education.

(Id. at NYU0020211.)

Tisch New York and Tisch Asia had several apparent differences: they were located in different cities and countries, and, though Tisch New York had existed for over fifty years, Tisch Asia was brand new. NYU argues that based on publicly available information, certain additional differences were apparent, including that New York is the media mecca of the world, while Singapore is a smaller market; Tisch Asia lacked many of the graduate and undergraduate programs available on Tisch's campus in New York, including acting, dance, and theater; and Tisch Asia's campus was smaller. Plaintiffs insist that these additional differences were not disclosed to students, who were instead told that there were no differences between Tisch New York and Tisch Asia.

6.  STUDENT EXPERIENCES

Plaintiff Basso attended Tisch Asia from 2012 until her graduation in 2014. Basso chose to attend Tisch Asia because of Tisch's general reputation and her understanding that it

had the same core curriculum as Tisch New York. Basso does not recall seeing representations regarding the facilities, equipment, or internship and professional development opportunities. Basso received a partial scholarship and financial aid to attend Tisch Asia.

Plaintiff Villa Ruiz attended Tisch Asia from 2011 until his graduation in 2014. Villa Ruiz applied to Tisch Asia because he wanted to study abroad and had already gone to school on the East Coast. Villa Ruiz does not recall seeing any particular information about the program before applying but ultimately decided to apply because Tisch had a reputation for "producing the best." Villa Ruiz either did not know or could not recall any information regarding the curriculum, facilities, equipment, or internship and professional development opportunities before enrolling. Villa Ruiz received a partial scholarship to attend Tisch Asia.

Plaintiff Hartman attended Tisch Asia from 2010 until withdrawing in 2012 to pursue a career opportunity. Hartman reviewed the website and faculty bios but does not recall seeing specific information regarding the curriculum, facilities, or internship and professional development opportunities before enrolling. She enrolled knowing the tuition and costs associated with the school.

NYU assisted students with some, but not all, aspects of their transition to Asia. While NYU helped students with obtaining a student pass and visa, students were responsible for their own living arrangements in Singapore, and NYU never represented it would be responsible for securing housing for Tisch Asia students.

7.    <u>TISCH ASIA FACULTY</u>

Tisch Asia full-time faculty were located through a search committee and hired upon recommendation from the appropriate Tisch Asia department Chair. Tisch Asia and Tisch New York faculty travelled between the programs, and faculty at both programs were paid similar amounts. Plaintiffs argue that while Tisch Asia was initially staffed with NYU's New York faculty, over time the school was staffed with less qualified faculty, including recent Tisch Asia graduates. Further, Plaintiffs contend that because of budgetary constraints, Tisch Asia faculty were required to teach an overloaded schedule, stretching faculty members thin and limiting student exposure to new perspectives. NYU does not deny that Tisch Asia hired faculty from its recent alumni. Tisch Asia included biographical information about its faculty members on its website and in its bulletins.

Plaintiffs contend that NYU did not deliver on its representation that its classes were taught by "world-

renowned" faculty. Basso claimed she understood something to be world renowned if there is a general public knowledge of that thing. Villa Ruiz understood the term to encompass those people whose works are internationally recognized, and he believed that a majority, but not all, of Tisch Asia faculty were world renowned. Hartman believes Tisch Asia's program was world renowned. NYU offered the declarations of several Tisch Asia alumni, Quester Hannah ("Hannah"), Bumsue Chun ("Chun"), and Philip Giordano ("Giordano") and claims that neither Hannah nor Chun interpreted the representation in any literal sense. Plaintiffs point out they have not been afforded the opportunity to cross examine these witnesses and therefore urge the Court to disregard their declarations.

Similarly, Plaintiffs contend that NYU did not deliver on its representation that Tisch Asia courses would be taught by "working professionals." Hartman defined "working professional" as someone who is actively working on films, television, or theater as opposed to exclusively teaching. Yet, Hartman described the term as a "slippery" one and believes the minimum standard of having "strong ties to the industry" is being able to identify a personal contact that worked in entertainment. Villa Ruiz assessed "working professional" by looking at a person's IMDB page for film or television credits.

All Plaintiffs provided positive feedback about their professors in course evaluations at the time they were submitted but have since qualified that positive feedback. Hannah, Giordano, and Chun provided similar positive feedback about Tisch Asia's professional training and faculty.

8.   TISCH ASIA'S PROFESSIONAL DEVELOPMENT AND RESUME BUILDING OPPORTUNITIES

According to NYU, Tisch Asia regularly provided guest lectures, master classes, and workshops from acclaimed filmmakers, writers, and actors. NYU also claims Tisch Asia offered a funded trip to the Hong Kong International Film & TV Market, which included instruction on networking for jobs at the event. Tisch Asia offered a similar trip to a production studio in Malaysia. NYU states that Tisch Asia students were provided professional development opportunities working in photography, editing, directing, and sound. NYU further contends that Tisch Asia hosted networking and alumni events, of which Plaintiffs took advantage.

NYU also claims Tisch Asia students were provided access to internships and professional development opportunities throughout Asia and in the United States. Tisch Asia students, according to NYU, had access to the same professional development services and databases as Tisch New York students and Tisch Asia professors assisted students with finding

professional opportunities. NYU maintains that Plaintiffs were aware to these resources and took advantage of them in varying ways during their time at Tisch Asia. But Plaintiffs dispute the extent to which these resources were provided and ultimately useful. Plaintiffs point out that there were 2,000 internships available in New York but comparatively few available in Singapore.

B.   THE PARTIES' ARGUMENTS

NYU argues that under New York's borrowing statute, all claims in this action are time barred. If Plaintiffs are afforded the longer statute of limitations of New York, then, according to NYU, the unjust enrichment claim is untimely, and as to class members who enrolled before September 20, 2010, all other claims must be dismissed.

Next, NYU argues that Plaintiffs' theory of damages is based on impermissible speculation.

NYU contends that Plaintiffs' negligent misrepresentation claim fails because (1) evidence developed during discovery demonstrates that Tisch Asia and its students did not have a special relationship; (2) the claim is barred by New York's economic loss rule; (3) Plaintiffs cannot demonstrate reasonable reliance because many alleged representations are too vague to induce reliance and Plaintiffs have not established that they actually saw or

relied on the allegedly false representations; (4) Plaintiffs cannot identify material false representations because Tisch Asia provided quality education; and (5) Plaintiffs cannot establish that NYU caused them harm.

NYU argues that Plaintiffs' fraud claim must also be dismissed because Plaintiffs cannot demonstrate reasonable reliance and also because they cannot establish that NYU made any material misrepresentation or omission with knowledge of its falsity and intent to deceive.

Finally, NYU claims that Plaintiffs' breach of contract claim must be dismissed because many of the statements Plaintiffs cite are not sufficiently specific to support a breach of contract claim. Additionally, NYU claims that this claim is grounded in an impermissible educational malpractice theory. Lastly, NYU contends this claim fails because NYU delivered on all the representations it made.

In their Opposition, Plaintiffs respond that NYU waived its statute of limitations argument by not including it in its Answer to the First Amended Complaint. Plaintiffs additionally argue that NYU's statute-of-limitations argument fails on its merits and cannot be used to narrow the class definition.

Plaintiffs argue all of their claims can proceed because they are not barred as impermissible claims for educational malpractice.

Plaintiffs further contend that issues of fact preclude summary judgment on their fraud claim. Plaintiffs argue that NYU concealed information regarding the financial health and viability of the school. Plaintiffs also contend that NYU made material misrepresentations about the program's offerings. Plaintiffs assert that NYU's intent with respect to these representations is an unresolved issue of fact.

Plaintiffs similarly argue their negligent misrepresentation claim should proceed because material issues of fact remain as to the falsity and intent of NYU's representations. Plaintiffs assert that whether the school had the "special relationship" necessary to adequately plead a negligent misrepresentation claim is likewise an unresolved factual issue.

Plaintiffs argue that their breach of contract claim should proceed because NYU made specific promises to its students which it then breached. Plaintiffs claim that their unjust enrichment claim should not be dismissed as duplicative because the elements of unjust enrichment are separate from its other claims.

Finally, Plaintiffs contend that their damages are not speculative as a matter of law, and that their exact damages amounts are also an unresolved question of fact to be proven at trial.

NYU replies that it has not waived its statute of limitations argument and that allowing the argument to proceed would not prejudice Plaintiffs. NYU reiterates that Plaintiffs' damages theory is impermissibly speculative and therefore fatal to all of their claims.

NYU further replies that it was under no obligation to disclose Tisch Asia's precarious financial situation to its students. Finally, NYU argues that the Court should reject Plaintiffs' theory that Tisch Asia and Tisch New York were meant to be identical programs and instead argues that natural differences existed between them.

## II.   LEGAL STANDARD

In connection with a motion for summary judgment under Federal Rule of Civil Procedure 56, "[s]ummary judgment is proper if, viewing all the facts of the record in a light most favorable to the non-moving party, no genuine issue of material fact remains for adjudication." Samuels v. Mockry, 77 F.3d 34, 35 (2d Cir. 1996) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-50 (1986)). The role of a court in ruling on such a motion "is not to resolve disputed issues

of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986).

The moving party bears the burden of proving that no genuine issue of material fact exists or that, because of the paucity of evidence presented by the nonmovant, no rational jury could find in favor of the nonmoving party. See Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223-24 (2d Cir. 1994). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of *material* fact." Anderson, 477 U.S. at 247-48.

In determining whether the moving party is entitled to judgment as a matter of law, the court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008). Though a party opposing summary judgment may not "rely on mere conclusory allegations nor speculation," D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998), summary judgment is improper if any evidence in the record allows a reasonable inference to be drawn in

favor of the opposing party, see Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

### III. DISCUSSION

A.   STATUTE OF LIMITATIONS

    1.   WAIVER

Plaintiffs argue that NYU waived its statute of limitations defense by not raising it in NYU's Answer to the First Amended Complaint. "A claim that a statute of limitations bars a suit is an affirmative defense, and, as such, it is waived if not raised in the answer to the complaint." Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc., 967 F.2d 742, 751-52 (2d Cir. 1992); see also Fed. R. Civ. Pro. 8(c). But "[i]t is well established . . . that an affirmative defense may be asserted even at summary judgment where the party opposing the affirmative defense has the opportunity to respond effectively to that defense, and has otherwise suffered no prejudice as a result of its late pleading." In re Livent, Inc. Noteholders Sec. Litig., 355 F. Supp. 2d 722, 727 (S.D.N.Y. 2005).

The Court will allow NYU to raise its statute of limitations defense. NYU raised a statute of limitations defense in its early letter-motions related to its Motion to Dismiss and was not afforded the opportunity to fully brief the issue. (See Dkt. Nos. 18, 25, 26.) NYU again raised the

defense in opposing Class Certification and the Court declined to rule on the issue at that time. (See Dkt. No. 97 at 12-13.) Further, Plaintiffs have been afforded the opportunity to address the merits of NYU's arguments and have not identified any prejudice that they might suffer as a result of NYU's late pleading. (See Opposition at 3-4).

    2.  WHETHER PLAINTIFFS' CLAIMS ARE TIME BARRED

When a cause of action accrues outside of New York to a non-New York resident, New York's choice of law borrowing statute applies to determine the appropriate statute of limitations. See N.Y. C.P.L.R. § 202; see also, In re Coudert Bros. LLP, 673 F.3d 180, 190 (2d Cir. 2012); Stuart v. Am. Cyanamid Co., 158 F.3d 622, 627 (2d Cir. 1998). Under the borrowing statute, a plaintiff's claim is not barred if it is timely under both the statute of limitations of New York and of the jurisdiction in which the cause of action accrued. See Antone v. Gen. Motors Corp., 473 N.E.2d 742, 744-45 (N.Y. 1984). "In using the word 'accrued' in CPLR § 202 there is no indication that the Legislature intended the term to mean anything other than . . . the time when, and the place where, the plaintiff first had the right to bring the cause of action." Glob. Fin. Corp. v. Triarc Corp., 715 N.E.2d 482, 484 (N.Y. 1999). Here, to apply the proper statute of limitations, the Court must determine (1) the residency of

each Plaintiff and (2) the location of the injury. Location is easily dealt with because "[w]hen an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss." Id. at 485.

The New York borrowing statute applies, and therefore, each Plaintiff's state of residence at the time their claim accrued would supply the statute of limitations so long as it is shorter than New York's. Each Plaintiff's state of residence is a matter of fact, but the record is undeveloped on this point. Although NYU argues that named Plaintiffs are residents of California, Colorado, and Georgia (see Motion at 4), this argument is premised on an unsupported conclusion that Plaintiffs' residencies at the time of filing this lawsuit was the same as their residencies at the time their claims accrued. It is the latter which controls the analysis, see Glob. Fin. Corp., 715 N.E.2d at 485, and therefore the Court is unable to draw conclusions about Plaintiffs' residencies that might shorten the limitations period.

Although the record does not allow the Court to make factual findings on Plaintiffs' residencies now, New York's statute of limitations does provide the outer limit on the accrual period for Plaintiffs' claims.

    a.   <u>NEGLIGENT MISREPRESENTATION AND FRAUD</u>

In New York, the statute of limitations for fraud and negligent misrepresentation is six years. See N.Y. C.P.L.R. § 213(1), (8). Thus, in this action only fraud or negligent misrepresentation claims accruing after September 19, 2010 will be timely.

This limitation restricts timely fraud and negligent misrepresentation claims to those Plaintiffs who enrolled at Tisch Asia initially in the 2011-2012 or 2012-2013 school year. This result follows because for both fraud and negligent misrepresentation, Plaintiffs' claims relate to statements made by NYU that induced Plaintiffs to enroll at Tisch Asia. (See, e.g., First Amended Complaint, ¶ 108). Thus, Plaintiffs cannot have an actionable fraud or negligent misrepresentation claim based on allegedly untrue statements Plaintiffs relied on *after* they enrolled. Plaintiffs who enrolled in the 2010-2011 school year (or earlier) could not have been induced to enroll after September 19, 2010.

b.   BREACH OF CONTRACT AND UNJUST ENRICHMENT

In New York, the statute of limitations for a claim of breach of contract or unjust enrichment pled in the alternative is six years from the date of the alleged breach. See N.Y. C.P.L.R. § 213(8); Maya NY, LLC v. Hagler, 965 N.Y.S.2d 475, 477 (App. Div. 1st Dept. 2013). Here again,

only breach of contract or unjust enrichment claims accruing after September 19, 2010 will be timely.

But unlike negligent misrepresentation and fraud, breach of contract and unjust enrichment claims could have accrued at any point during each school year. Thus, in addition to Plaintiffs who enrolled in the 2011-2012 through 2014-2015 school years, Plaintiffs enrolled initially in the 2010-2011 school year may have timely breach of contract claims.

B. ECONOMIC LOSS

"Under New York law, a tort action for economic loss will not lie where the parties' relationship is governed by an express contract." Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n, 328 F. Supp. 3d 141, 157-58 (S.D.N.Y. 2018) (quoting Commerzbank AG v. U.S. Bank Nat'l Ass'n, 277 F. Supp. 3d 483, 496 (S.D.N.Y. 2017)); Carmania Corp., NV v. Hambrecht Terrell Int'l, 705 F. Supp. 936, 938 (S.D.N.Y. 1989). Accordingly, generally "if the damages suffered are of the type remediable in contract, a plaintiff may not recover in tort." Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A., 244 F.R.D. 204, 220 (S.D.N.Y. 2007).

Even when the "duty breached . . . is independent of any contract between the parties," the economic loss doctrine still may prevent otherwise viable tort claims without damages independent from the contract claim. Id.; see also

Clark-Fitzpatrick, Inc. v. Long Island R.R. Co._, 516 N.E.2d 190, 194 (N.Y. 1987). Thus, to sustain a tort claim in the face of a related contract claim, plaintiffs must generally show (1) the existence of an extra-contractual duty, and (2) independent damages flowing from that duty. Plaintiffs here have demonstrated neither.

First, in New York the student-university relationship is contractual. See, e.g., Deen v. New School Univ._, 2007 WL 1032295, at *2 (S.D.N.Y. Mar. 27, 2007); Keles v. N.Y. Univ._, No. 91 Civ. 7457, 1994 WL 119525, at *4-5 (S.D.N.Y. Apr. 6, 1994). "The terms of the agreement are supplied by the bulletins, circulars and regulations made available to the student." Papspiridakos v. Educ. Affiliates, Inc., No. 10 Civ. 5628, 2013 WL 4899136, at *2 (S.D.N.Y. Sept. 11, 2013). The alleged misrepresentations Plaintiffs complain of -- the FAQ posted on the Tisch Asia website, the "About Tisch Asia" webpage, and the message from the Chairman of the school (see First Amended Complaint, ¶¶ 21-54) -- are sources from which the "terms of the agreement" may be drawn. Papspiridakos, 2013 WL 4899136, at *2. Indeed, Plaintiffs' First Amended Complaint and Opposition do not distinguish between representations as the basis for Plaintiffs' negligent misrepresentation and fraud claims on the one hand and the

breach of contract claim on the other. But, Plaintiffs cannot have it both ways.

Thus, because the actionable language Plaintiffs allege is part of the contractual relationship between the parties, no extra-contractual duty arises from it. See Ambac Assurance Corp., 328 F. Supp. 3d at 157-58. To the extent Plaintiffs' tort claims are premised on those contractual representations, they are dismissed. While it may be possible for a student to demonstrate an extra-contractual duty taken on by a university in some circumstances, that is not the case where there are no allegations of misrepresentations outside of the contract. See, e.g., Keles, 1994 WL 119525, at *7 ("Simple breach of contract does not constitute fraud."); Moy v. Adelphi Inst., Inc., 866 F. Supp. 696, 706-07 (E.D.N.Y. 1994) ("New York law does not allow for a cause of action based on negligent misrepresentation in the educational context.").

Second, Plaintiffs' First Amended Complaint identifies only economic harm they suffered from the alleged misrepresentations made by Defendant. (See First Amended Complaint, ¶ 117.) Plaintiffs' Opposition, in detailing their damages theory, again references only economic loss Plaintiffs allegedly suffered because of the poor value of the education they claim Tisch Asia provided. (See Opposition

at 24-25.) Because Plaintiffs have not demonstrated -- and the Court is not persuaded the record reflects -- any independent injury that is not otherwise remediable in contract, the Court will dismiss Plaintiffs' tort claims.

Therefore, based on the economic loss doctrine, the negligent misrepresentation and fraud claims are dismissed.

C.   <u>NEGLIGENT MISREPRESENTATION</u>

Even if the economic loss doctrine would not preclude Plaintiffs' negligent misrepresentation claims, the Court finds that no extra-contractual duty is created by the alleged "special relationship" Plaintiffs contend NYU had with them. In the context of negligent misrepresentation, whether there is a special relationship between two parties is generally an issue of fact. <u>See</u> <u>Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank</u>, 250 F. 3d 87, 103 (2d Cir. 2001) (citing <u>Kimmel v. Schaefer</u>, 675 N.E.2d 450 (N.Y. 1996)).

Negligent misrepresentation claims made by students against a university, however, present a special case. Courts have routinely found that a university holds no special relationship with its students. <u>See</u> <u>Matter of Salvador v. Touro Coll.</u>, 27 N.Y.S.3d 44, 48-49 (App. Div. 1st Dept. 2016) (granting a motion to dismiss the plaintiff's negligent misrepresentation claim because of a lack of a special relationship between the student and law school); <u>Gomez-</u>

<u>Jimenez v. N.Y. Law Sch.</u>, 956 N.Y.S.2d 54, 60 (App. Div. 1st Dept. 2012) (dismissing a negligent misrepresentation claim based on a law school's alleged fraudulent concealment of post-graduate employment statistics because of a lack of a special relationship with prospective students); <u>Ansari v. N.Y. Univ.</u>, No. 96 Civ. 5280, 1997 WL 257473, at *5-6 (S.D.N.Y. May 16, 1997) (explaining that the student and university "were involved in an ordinary buyer and seller relationship, and a negligent misrepresentation claim requires a closer degree of trust and reliance than that of ordinary buyer and seller"); <u>see</u> <u>also</u> <u>Hargrave v. Oki Nursey, Inc.</u>, 636 F.2d 897, 899 (2d Cir. 1980); <u>Kickertz v. N.Y. Univ.</u>, 971 N.Y.S.2d 271, 279 (App. Div. 1st Dept. 2013).

Despite this weight of authority, Plaintiffs contend that Tisch Asia students were uniquely dependent on the university because many students were forced to move to Singapore to enroll. Even taking that to be true, that is insufficient to support a "special relationship." <u>See</u> <u>Jeffers v. Am. Univ. of Antigua</u>, 3 N.Y.S.3d 335, 338-39 (App. Div. 1st Dept. 2015) (finding no special relationship despite the fact that many students relocated from the United States to Antigua to enroll in the university).

Furthermore, Plaintiffs' alleged misrepresentations are disconnected from the purported basis for the "special

relationship." In other words, there are only bare allegations that NYU has unique or special expertise in helping students relocate to Singapore. For example, NYU did not assist students with housing. This is fatal, as a party's unique expertise is what gives rise to an enhanced duty. See Murphy v. Kuhn, 90 N.Y.2d 266, 270 (N.Y. 1997); Kimmell v. Schaefer, 89 N.Y.2d 257, 260 (N.Y. 1997).

Moreover, under Plaintiffs' theory, allegedly false representations about the Tisch Asia program were presumably provided to induce all prospective students to enroll, irrespective of whether those students were required to move across the world or were already based in Singapore. But, NYU cannot have supplied information *specifically* to induce all prospective students to move halfway around the world because many prospective students would have already been living in or relatively near Singapore. Plaintiffs' position would require the improbable presumption that the school had a "special relationship" with certain prospective students living in the United States and other countries outside of Singapore, but not with prospective students already living in Singapore.

Finally, Plaintiffs' negligent misrepresentation claim fails for one additional separate reason: Plaintiffs have failed to establish that a "special relationship" can exist

between a university and prospective, rather than attending, students. To sustain a negligent misrepresentation claim, Plaintiffs must have relied on NYU's representations prior to incurring any alleged harm. See Keles, 1994 WL 119525, at *7; Morin v. Trupin, 711 F. Supp. 97, 104 (S.D.N.Y. 1989). For the negligent misrepresentation claim, the alleged harm is Plaintiffs' having been induced to enroll in the university. (See First Amended Complaint, ¶ 99.) But, based on the special relationship doctrine and applicable case law discussed above, the Court is not persuaded that as a matter of law a university has any meaningful special relationship with *prospective* students browsing its website. See, e.g., Sec. Inv'r Prot. Corp. v. BDO Seidman, LLP, 222 F.3d 63, 73 (2d Cir. 2000) ("In New York, a plaintiff claiming negligent misrepresentation against an accountant with whom he has no contractual relationship faces a heavy burden."); McGill v. Gen. Motors Corp., 647 N.Y.S.2d 209, 209 (App. Div. 1st Dept. 1996) ("[M]ass communication cannot establish privity with unidentified members of the public."); Tuosto v. Phillip Morris USA Inc., No. 05 Civ. 9384, 2007 WL 2398507, at *14 (S.D.N.Y. Aug. 21, 2007).

For the preceding reasons, the Court is not persuaded that as a matter of law a "special relationship" between

Plaintiffs and NYU existed here. Accordingly, Plaintiffs'
negligent misrepresentation claim is dismissed.

D.   <u>FRAUD</u>

   Although Plaintiffs' fraud claim may be properly
dismissed under the economic loss doctrine, as discussed
above, Plaintiffs raise one separate argument independent of
specific misrepresentations: that NYU committed fraud by
concealing key facts about the overall financial well-being
and sustainability of the Tisch Asia program. (<u>See</u> Opposition
at 11-14.) Properly read, this claim does not constitute a
fraud action, but rather one for fraudulent concealment. <u>See</u>
<u>VR Optics, LLC v. Peloton Interactive, Inc.</u>, No. 16 Civ. 6392,
2017 WL 3600427, at *11-12 (S.D.N.Y. Aug. 18, 2017) ("New
York recognizes a cause of action to recover damages for fraud
based on concealment, where the party to be charged has
superior knowledge or means of knowledge, such that the
transaction without disclosure is rendered inherently
unfair." (quotation and citation omitted)); <u>see also</u> <u>De Sole</u>
<u>v. Knoedler Gallery, LLC</u>, 974 F. Supp. 2d 274, 311-14
(S.D.N.Y. 2013). "The elements of a fraudulent concealment
claim are: (1) a duty to disclose material facts; (2)
knowledge of material facts by a party bound to make such
disclosures; (3) failure to discharge a duty to disclose; (4)

scienter; (5) reliance; and (6) damages." Woods v. Maytag Co., 807 F. Supp. 2d 112, 124 (E.D.N.Y. 2011).

Here, the Court will not consider Plaintiffs' arguments under a fraudulent concealment theory because in their First Amended Complaint they do not allege fraudulent concealment. But even if it were to consider such a claim, the Court would dismiss it because as a matter of law a university has no general obligation to disclose business records and financial data to its students. See Maas v. Cornell Univ., 94 N.Y.2d 87, 92 (1999); see also Squeri v. Mount Ida Coll., 954 F.3d 56, 67-68 (1st Cir. 2020). Charging an educational institution with such a duty would require courts to second guess academic judgement relating to purely internal matters, a burden New York courts have long rejected. See Torres v. Little Flower Children's Servs., 64 N.Y.2d 119, 126-27 (N.Y. 1984); Gertler v. Goodgold, 107 A.D.2d 481, 485-86 (App. Div. 1st Dept. 1985); see also Sirohi v. Lee, 222 A.D.2d 222, 222 (App. Div. 1st Dept. 1995). Thus, Plaintiffs' arguments purportedly alleging fraudulent concealment also fail.

E.   BREACH OF CONTRACT

As previously explained, New York law recognizes that the "relationship between a university and its students is contractual in nature." Yu v. Vassar Coll., 97 F. Supp. 3d. 448, 481 (S.D.N.Y. 2015). When a student is admitted to a

school, an implied contract forms "and the terms of the agreement are supplied by the bulletins, circulars and regulations made available to the student." Papspiridakos, 2013 WL 4899136, at *2 (quoting Dasrath v. Ross Sch. of Med., 494 F. App'x 177, 178 (2d Cir. 2012)). However, the "mere allegation of mistreatment without the identification of a specific breached promise or obligation does not state a claim on which relief can be granted." Gally v. Columbia Univ., 22 F. Supp. 2d 199, 207 (S.D.N.Y. 1998). To state a claim for breach of the implied contract that arises between a student and a university, a student must identify "specifically designated and discrete promises" that were broken by the university. Ward v. N.Y. Univ., 99 Civ. 8733, 2000 WL 1448641, at *4 (S.D.N.Y. Sept. 28, 2000). Consistent with the rejection of the tort of educational malpractice, claims complaining of the general quality of education, broad-based policy statements, and vague and generalized representations are not actionable. See Gally, 22 F. Supp. 2d at 206-07.

While the parties dispute whether NYU's representations are contractual terms, and if so whether NYU followed through on those promises, the Court need not reach those arguments here. As a threshold matter, Plaintiffs must demonstrate concrete harm resulting from NYU's alleged breach of contract. See Lama Holding Co. v. Smith Barney Inc., 668

N.E.2d 1370, 1376 (N.Y. 1996). But Plaintiffs have not identified any basis for the Court to conclude that they may have suffered harm. Therefore, the breach of contract claim is dismissed. See Clarke v. Trs. of Columbia Univ., 1996 WL 609271, at *5 (S.D.N.Y. Oct. 23, 1996).

Beyond their conclusory allegations of injury they suffered, Plaintiffs have presented no admissible evidence establishing consequential damages, such as demonstrable educational opportunities foregone, particular job opportunities missed, specific future income potentially lost, or any other potential damages of the type courts have recognized in breach of contract claims asserted by students against a university. See, e.g., Geffner v. Iona Coll., 13 Civ. 1156, 2013 WL 5549922, at *3 (S.D.N.Y. Oct. 2, 2013). Absent such allegations of tangible consequential damages, Plaintiffs are forced to ground their contract action on the claimed difference in educational quality between Tisch New York and Tisch Asia. But Plaintiffs' only factual allegation regarding this difference is that one Plaintiff evaluated her education at Tisch Asia with the same value as a less costly undergraduate degree. (See Opposition at 25.) This conclusory statement, even if true, is insufficient to plead a sufficient claim of damages based on a breach of contract. See Paladino, 454 N.Y.S.2d at 873 ("[C]laims concerning misrepresentation

as to the quality *or comparative quality of the education*"
are "not actionable") (emphasis added).

Instead of factual allegations of harm, Plaintiffs rely
on conclusions about the difference in "the quality of the
faculty," "access to career development opportunities," "the
facilities," and "the availability of scholarships," absence
of a cafeteria or elevator, interruption of classes by
construction noise, all of which meant, according to
Plaintiffs, that tuition at "the Tisch Asia program was
grossly inflated compared to the value received."[3] (Opposition
at 24-25). But students' complaints about the general quality
of the education they received and invitations for courts to
make comparative value judgments between academic programs
both constitute essentially repackaged actions asserting
educational malpractice, and courts have repeatedly rejected
such claims. See, e.g., Papspiridakos, 2013 WL 4899136, at
*3-6; Ward, 2000 WL 1448641, at *4; Mihalakis v. Cabrini Med.
Ctr., 542 N.Y.S.2d 988, 989-90 (App. Div. 1st Dept. 1989);
Sirohi, 222 A.D.2d at 222; see also Ross v. Creighton Univ.,
957 F.2d 410, 414-15 (7th Cir. 1992). Here, the Court will
adhere to these well-established precedents. Thus,
Plaintiffs' breach of contract claims are dismissed.

---

[3] Of course, the undisputed allegations show that the Plaintiffs were
awarded at least partial scholarships to attend Tisch
Asia, lowering the out-of-pocket costs these Plaintiffs incurred.

F.   <u>UNJUST ENRICHMENT</u>

"To state a claim for unjust enrichment, a plaintiff must plead that (1) the defendant was enriched (2) at the plaintiff's expense and (3) under the circumstances of such enrichment equity and good conscience require the defendant to make restitution." <u>Goldemberg v. Johnson & Johnson Consumer Cos., Inc.</u>, 8 F. Supp. 3d 467, 483 (S.D.N.Y. 2014). Because Plaintiffs have identified no harm they suffered resulting from any alleged breach of contract by NYU, Plaintiffs have failed to demonstrate that "equity" or "good conscience" would require NYU to make restitution here.

Even if they had specified particular harms stemming from the alleged breach of contract, Plaintiffs' unjust enrichment claim fails as a matter of law. Unjust enrichment lies only "as a quasi-contract claim." <u>Goldman v. Metro. Life Ins. Co.</u>, 841 N.E.2d 742, 746 (N.Y. 2005). When parties are bound by a "contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded." <u>IDT Corp. v. Morgan Stanley Dean Witter & Co.</u>, 907 N.E.2d 268, 274 (N.Y. 2009); <u>see</u> <u>also</u> <u>Clark-Fitzpatrick Inc.</u>, 516 N.E.2d at 193. "Unjust enrichment may be pled in the alternative, but only where there is a bona fide dispute as to whether a relevant

contract exists or covers the disputed issue." Downey v. Adloox Inc., 238 F. Supp. 3d 514, 526 (S.D.N.Y. 2017).

In this case, the parties do not dispute that a contract exists between Plaintiffs and NYU relating to Plaintiffs' education at Tisch Asia. See Yu, 97 F. Supp. 3d at 481. Nor is there disagreement that the contract's terms cover the disputed issue. In fact, Plaintiffs expressly rely on the terms of the underlying contract. Thus, without any allegation that the contract is inapplicable to this dispute, there is no prospect in which Plaintiffs can recover under a theory of unjust enrichment in the alternative, even if their contract claim fails. See Yalincak v. N.Y. Univ., 08 Civ. 773, 2009 WL 10714654, at *14 (D. Conn. Sept. 3, 2009) ("Because Plaintiff and NYU had a contract, he cannot bring an action for unjust enrichment.") (applying New York law). Plaintiffs' unjust enrichment claim is therefore dismissed.

### IV.   **CONCLUSION**

Accordingly, for the reasons stated above, it is hereby

**ORDERED** that the motion of defendant New York University for summary judgment on Counts One, Five, Six, and Seven of the First Amended Complaint (Dkt. No. 22) is **GRANTED**.

The Clerk of Court is directed to dismiss all pending motions and to close this case.

**SO ORDERED.**

Dated: New York, New York
      30 November 2020

                                      Victor Marrero
                                      U.S.D.J.